**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SOUTH COAST AIR QUALITY
MANAGEMENT DISTRICT,
                        *Petitioner,*

            v.

FEDERAL ENERGY REGULATORY
COMMISSION,
                        *Respondent,*

            and

PUBLIC UTILITIES
COMMISSION OF THE STATE OF
CALIFORNIA; SEMPRA LNG
MARKETING CORP.; NORTH BAJA
PIPELINE, LLC; SHELL ENERGY
NORTH AMERICA (U.S. L.P.); SAN
DIEGO GAS & ELECTRIC COMPANY;
SOUTHERN CALIFORNIA GAS
COMPANY,
                        *Intervenors.*

No. 08-72265

FERC Nos.
CP06-61-000
CP06-61-001
CP06-61-002
CP06-61-003
CP06-61-004

OPINION

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

Argued and Submitted
November 2, 2009—San Francisco, California

Filed September 9, 2010

Before: Michael Daly Hawkins and Sidney R. Thomas,
Circuit Judges, and Edward R. Korman,* District Judge.

*The Honorable Edward R. Korman, Senior United States District
Court Judge, Eastern District of New York, sitting by designation.

13803

Opinion by Judge Korman

## COUNSEL

Daniel P. Selmi, Los Angeles, California, and Deborah L. Keeth, Shute, Mihaly & Weinberger, San Francisco, California, for the petitioner.

Holly E. Cafer, Federal Energy Regulatory Commission, Washington, D.C., for the respondent.

Harvey Y. Morris, San Francisco, California, for Intervenor Public Utilities Commission of the State of California.

John R. Ellis, Los Angeles, California, for Intervenors Southern California Gas Company and San Diego Gas & Electric Company.

Catherine E. Stetson and Lee A. Alexander, Hogan & Hartson LLP, Washington, D.C., for Intervenor North Baja Pipeline, LLC.

William D. Rapp, Sempra Energy, San Diego, California, for Intervenor Sempra LNG Marketing Corp.

Jeffrey D. Watkiss, Bracewell & Giuliani, Washington, D.C., for Intervenor Shell Energy North America (US), L.P.

---

**OPINION**

KORMAN, District Judge:

Natural gas is generally regarded as the cleanest conventional fossil fuel. Nevertheless, as the dispute that forms the basis of this appeal demonstrates, the burning of this energy source releases air pollutants—namely, nitrogen oxides ($NO_x$), the precursors that lead to the chemical formation of ozone and particulate matter, two federally-regulated pollutants and the focus of this litigation. The Wobbe Index ("WI") is a measure of natural gas interchangeability. It is based on the heating value and specific gravity of the gas, and often referenced as a proxy for natural gas quality. Gas with a higher WI number produces more heat because it burns hotter than gas with a lower number. As the WI of a quantity of gas increases, the $NO_x$ emissions from the gas increase as well. The WI of gas may vary depending on its source—the gas historically burned in California originates exclusively in North America, and the five-year historical WI average for gas used in the Basin Region of Southern California ("Basin") is 1332. Foreign-sourced natural gas, on the other hand, often has an average WI that is higher than that of domestic sources, but may be commingled or blended with other gasses to lower that value.

Foreign-sourced liquefied natural gas arrives in North America in condensed form after having been shipped on tankers. On arrival, it is regasified at terminals and ultimately transported through pipelines to end users. North Baja Pipe-

line, LLC ("North Baja") operates an interstate natural gas pipeline system that extends eighty miles from an interconnection with El Paso Natural Gas Company near Ehrenberg, Arizona, through southeast California to the international border between Yuma, Arizona and Mexicali, North Baja Mexico, and currently transports gas in the southbound direction only. It commenced the underlying proceeding on February 7, 2006 by applying for a certificate of public convenience and necessity with the Federal Energy Regulatory Commission ("FERC") pursuant to Section 7(c) of the Natural Gas Act, 15 U.S.C. § 717(f)(c). The certificate would authorize the expansion and modification of North Baja's existing pipeline system to allow for the transport of foreign-sourced natural gas in the opposite direction, from Mexico northbound into the Basin.

The Basin consists principally of four counties—Orange County and the non-desert portions of Los Angeles, Riverside, and San Bernardino Counties—that comprise the jurisdictional area of South Coast Air Quality Management District ("South Coast"). Once completed, the expanded pipeline would have the capacity to transport gas into the California system through an interconnection with Southern California Gas Company ("SoCalGas"), a public utility corporation that delivers gas throughout the Basin.

In 2007, FERC released an environmental impact statement ("EIS") for the project, the purpose of which was to detail and consider any environmental impacts associated with the North Baja pipeline project. FERC filed the EIS with the Environmental Protection Agency ("EPA") and included responses to all comments received during the public comment period. Both South Coast and the EPA filed written responses to this document. South Coast, which had intervened in the proceedings, claimed that FERC was in violation of its duties under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f, the Clean Air Act, 42 U.S.C. §§ 7401-7671q, and the Natural Gas Act. Specifically, South Coast alleged

that FERC's EIS only examined the environmental impact relating to the construction and operation of the new pipeline itself, and urged FERC to also consider the impact of the emissions resulting from the eventual use of the pipeline's gas by consumers in the Basin and to adopt measures to mitigate that impact.

Shortly thereafter, FERC issued an order approving the project, which authorized the construction of new facilities to allow for the northward flow of gas. *North Baja Pipeline, LLC*, 121 FERC ¶ 61,010 (Oct. 2, 2007), *reh'g denied*, 123 FERC ¶ 61,073 (Apr. 24, 2008). The order confirmed FERC's earlier environmental review and adopted twenty-one enumerated environmental conditions relating to the construction of the pipeline and its continued transport of gas. FERC also required that the North Baja pipeline only deliver gas that meets the strictest gas quality standards imposed by state regulatory agencies on downstream end-users and pipelines, which, in light of California's gas standards, meant that the North Baja gas could not exceed a WI level of 1385. FERC found that compliance with these standards "should not result in a material increase in air pollutant emissions and, therefore, should not result in material changes in air quality in the Basin."

Moreover, although South Coast had argued previously for a maximum WI of 1360 in California, FERC observed that "[t]he record contains no analysis or evidence showing a material change in air quality impacts as a result of the consumption of natural gas with a WI of 1385 . . . compared to that of [South Coast's] proposed WI limit of 1360."

South Coast, acting alone, filed a Request for Rehearing of FERC's Order. FERC denied the request and South Coast filed the instant petition for review.

## I.   Regulatory Background

Before turning to the arguments in this case, we briefly outline the statutory and regulatory history of the natural gas

industry in order to provide the background for FERC's role in regulating the burning of natural gas in California. "By 1938, in a series of Commerce Clause cases, the Supreme Court established that states could regulate the intrastate and interstate transportation and sale of natural gas to ultimate consumers . . . ." *Mich. Consol. Gas Co. v. Panhandle E. Pipe Line Co.*, 887 F.2d 1295, 1299 (6th Cir. 1989). The states, however, "could not reach indirect sales for resale, such as a pipeline's sale to [a local distribution company] for resale." *Id.* This inability to regulate wholesale interstate transactions created a "regulatory void," *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 292 (1997), and "handicapped their ability to regulate the natural gas industry and left consumers at the mercy of producers and pipeline companies," *Mich. Consol. Gas*, 887 F.2d at 1299 (citing *Panhandle E. Pipe Line Co. v. Pub. Serv. Comm'n of Indiana*, 332 U.S. 507, 515-16 (1947)).

In response, Congress passed the Natural Gas Act, "a comprehensive scheme of federal regulation of 'all wholesales of natural gas in interstate commerce.' " *Northern Natural Gas Co. v. State Corp. Comm'n*, 372 U.S. 84, 91 (1963) (quoting *Phillips Petroleum Co. v. Wisconsin*, 347 U.S. 672, 682 (1954)). Through the Natural Gas Act, Congress " 'meant to create a comprehensive and effective regulatory scheme' of dual state and federal authority." *Fed. Power Comm'n v. La. Power & Light Co.*, 406 U.S. 621, 631 (1972) (quoting *Panhandle E. Pipe Line*, 332 U.S. at 520). It accomplished this by granting FERC exclusive jurisdiction to "fill the regulatory void" described above. *Gen. Motors*, 519 U.S. at 292; *Mich. Consol. Gas*, 887 F.2d at 1299.[1] In Section 1(b) of the Natural Gas Act, Congress vested FERC with authority over just three

---

[1]Natural Gas Act jurisdiction was originally delegated to the Federal Power Commission ("FPC"). In 1977, the FPC was renamed FERC pursuant to the Department of Energy Organization Act. Pub. L. No. 95-97, 91 Stat 565. Though cases decided prior to 1977 refer only to the FPC, for purposes of this opinion, the name "FERC" will be used to indicate either FERC or its predecessor agency, the FPC.

domestic areas: 1) the "transportation of natural gas in inter-state commerce," 2) the "sale in interstate commerce of natural gas for resale," and 3) "natural-gas companies engaged in such transportation or sale." 15 U.S.C. § 717(b). Notably however, the Natural Gas Act specifically exempted from federal regulation the "local distribution of natural gas" *i.e.*, the means by which end users obtain their gas. *Id.*; *see also Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 365 U.S. 1, 27 (1961); *Panhandle E. Pipeline*, 332 U.S. at 516. Similarly, section 1(c) of the Natural Gas Act, the so-called "Hinshaw Amendment," "exempts from FERC regulation intrastate pipelines [such as SoCalGas] that operate exclusively in one State and with rates and service regulated by the State." *Gen. Motors*, 519 U.S. at 284 n.3.

Federal regulation by FERC "was to be broadly complementary to that reserved to the States, so that there would be no 'gaps' for private interests to subvert the public welfare." *Louisiana Power & Light Co.*, 406 U.S. at 631. But, while FERC's and the states' respective areas of jurisdiction were designed to coordinate with each other, *United States v. Pub. Utils. Comm'n*, 345 U.S. 295, 311 (1953), "Congress meant to draw a bright line easily ascertained, between state and federal jurisdiction," *Fed. Power Comm'n v. S. Cal. Edison Co.*, 376 U.S. 205, 215 (1964). Significantly, FERC's authority "was drawn very meticulously and has been interpreted narrowly to affect *only those areas* that were outside of the states' regulatory reach at the time it was passed." *Mich. Consol. Gas*, 887 F.2d at 1299 (emphasis added) (citing *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 305 (1988); *Panhandle E. Pipe Line*, 332 U.S. at 516-17; *Fed. Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 610 (1944)). As the Supreme Court has held:

> The [Natural Gas Act], though extending federal regulation, had no purpose or effect to cut down state power. On the contrary, perhaps its primary purpose was to aid in making state regulation effective, by

adding the weight of federal regulation to supplement and reinforce it in the gap created by the prior decisions. The Act was drawn with meticulous regard for the continued exercise of state power, not to handicap or dilute it in any way.

*Panhandle E. Pipe Line*, 332 U.S. at 517-18 (footnote omitted).

Courts have strictly enforced this delineation between state and federal power. Particularly apposite is *Altamont Gas Transmission Company v. FERC*, 92 F.3d 1239 (D.C. Cir. 1996), in which the D.C. Circuit held that FERC had exceeded its jurisdiction by promulgating orders explicitly intended to affect the local rate-setting for an intrastate "Hinshaw" pipeline, an action that undisputedly fell within the State of California's sole jurisdiction. *Id.* at 1246-47. The D.C. Circuit explained that FERC had no authority "to do indirectly what it could not do directly." *Id.* at 1248. It concluded:

Although [FERC] ordinarily has the authority to consider a matter beyond its jurisdiction if the matter affects jurisdictional sales—at least if there would otherwise be a regulatory gap—here there is no such gap but, on the contrary, an express congressional reservation of jurisdiction to another body.

*Id.*; *see also Colorado Interstate Gas Co. v. Fed. Power Comm'n*, 185 F.2d 357, 360 (3d Cir. 1950).

In sum, the history and judicial construction of the Natural Gas Act suggest that all aspects related to the direct consumption of gas—such as passing tariffs that set the quality of gas to be burned by direct end-users—remain within the exclusive purview of the states. Against this backdrop, we now turn to the issue of FERC's obligation under NEPA to consider the environmental impact of the end-use burning of gas in the

Basin—an area within the jurisdiction of the State of California, and more particularly, of the Public Utilities Commission of the State of California ("CPUC"), and which FERC is without power to regulate.

## II.   Discussion

*A.   NEPA*

**[1]** NEPA establishes a "national policy [to] encourage productive and enjoyable harmony between man and his environment," and was intended to promote "the understanding of the ecological systems and natural resources important to the" United States. 42 U.S.C. § 4321. It requires a federal agency, "to the fullest extent possible," to prepare a detailed EIS regarding the environmental impact of "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C)(I), with "major Federal actions" defined as including "actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18 (2003).

The purpose of NEPA is twofold: 1) to ensure that the agency proposing major federal action "will have available, and will carefully consider, detailed information concerning significant environmental impacts," *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989), and 2) to guarantee that the relevant information will be made available to the larger public audience. *See* 42 U.S.C. § 4332(2)(C). Notably, however, "NEPA itself does not mandate particular results" in order to accomplish these ends. *Robertson*, 490 U.S. at 350. Rather, it imposes only procedural requirements on federal agencies to undertake analysis of the environmental impact of their proposals and actions. *Id.* at 349-50; *see also* James J. Hoecker, *The NEPA Mandate and Federal Regulation of the Natural Gas Industry*, 13 Energy L.J. 265, 265 (1992) ("NEPA is more procedural than prophylactic."). Moreover, NEPA may not be used to broaden FERC's

congressionally-limited role. *See Natural Res. Def. Council, Inc. v. U.S. EPA*, 822 F.2d 104, 129 (D.C. Cir. 1987) ("NEPA, as a procedural device, does not work a broadening of the agency's substantive powers"); *Cape May Greene, Inc. v. Warren*, 698 F.2d 179, 188 (3d Cir. 1983) ("[NEPA] does not expand the jurisdiction of an agency beyond that set forth in its organic statute . . . .")

We review FERC's substantive NEPA decisions under the arbitrary and capricious standard, for the purpose of determining that the agency "has adequately considered and disclosed the environmental impact of its actions." *Am. Rivers v. FERC*, 201 F.3d 1186, 1194-95 (9th Cir. 1999) (quoting *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1183 (9th Cir. 1997); *see also Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp.*, 222 F.3d 677, 680 (9th Cir. 2000) (A court will approve an EIS if it contains "a reasonably thorough discussion.").

South Coast argues that when FERC approved the North Baja pipeline project, it was required under NEPA to analyze the environmental impacts of emissions resulting from the burning of gas supplied by the pipeline to consumers in the Basin. The adequacy of FERC's NEPA analysis involves two separate issues. The first is whether FERC was obligated to consider the environmental impact of the emissions caused by the burning of North Baja gas by end users in the Basin. The second is whether, assuming FERC was obligated to do so, it adequately considered the impact in its EIS. We need not resolve the first question. While FERC argues that it was not obligated to address the potential impact of the end-use of North Baja gas in its NEPA analysis, it explicitly stated in its Order Denying Rehearing that it had considered that impact in its 250-page EIS. Under these circumstances, we turn directly to the issue of the adequacy of the EIS in this regard.

1.   *FERC's Analysis*

FERC evaluated the effects of the pipeline construction project in both a draft and final EIS, and a proposed land use

plan amendment prepared jointly with the California State Lands Commission. FERC made its draft EIS available to the public, publishing it in the Federal Register, mailing it to approximately 1,000 interested parties, including federal, state, and local governmental agencies, elected officials, Native American tribes, and affected landowners, and circulating it for public comment for a period of ninety days. In addition, two public meetings were held in California to solicit comments on the statement.

After nearly two years of preparation and public input, FERC released its final EIS, which acknowledged concerns of commentators that "the introduction of the [foreign-sourced liquefied natural gas] would substantially increase emissions of the ozone precursor $NO_x$ in the South Coast Air Basin, directly affecting air quality and making attainment of the Federal air quality standards more difficult." After acknowledging that there exists the potential for environmental effects stemming from the North Baja project, FERC determined that the North Baja pipeline certificate should be conditioned on compliance with CPUC's maximum WI level of 1385. Specifically, FERC's final EIS required North Baja to "only deliver gas that meets the strictest applicable gas quality standards imposed by state regulatory agencies on downstream [local distribution companies] and pipelines."

[2] Based on CPUC's earlier gas quality findings, which lowered the maximum WI for gas burned in California from 1437 to 1385, FERC determined that "consumption of [gas] transported by North Baja and meeting CPUC's WI standard of 1385 or less, *by definition*, should not result in a material increase in air pollutant emissions," regardless of the type or source of natural gas entering the Basin by way of the North Baja pipeline (emphasis added). In sum, in its EIS, FERC explicitly considered the environmental impact of downstream emissions and imposed what it reasonably believed to be effective measures to mitigate the impact.

**[3]** Significantly, in its comments on FERC's draft EIS, the EPA had specifically suggested that the final EIS should "address the North Baja's commitment to provide a supply of natural gas within a specific range. One alternative is to require that the natural gas meet, within some level of variability, the quality of natural gas currently flowing in the Southwest natural gas transmission pipeline." By requiring North Baja gas to conform to the gas quality standards set by CPUC, which represent a 4% deviation from the historic WI average of gas flowing in California, FERC did what was recommended by the EPA. While this may not have alleviated all of the EPA's concerns, FERC satisfied its obligation to "consider the views of other agencies," even though it was "not obligated to defer to that agency's view." *See Fuel Safe Wash. v. FERC*, 389 F.3d 1313, 1332 (10th Cir. 2004). We observe that the EPA has not intervened in this case in support of South Coast, even though FERC is an independent regulatory agency.

**[4]** Moreover, FERC's analysis was reasonably thorough, given circumstances that suggest a significant amount of uncertainty regarding the issue of the ultimate impact of burning imported natural gas delivered by North Baja. Specifically, in its Certificate Order, FERC states that "[t]he factors necessary for an analysis of whether and how the end use of the gas transported by North Baja will impact air quality . . . are unknowable at this time." FERC identified several unknown variables, including: 1) the WI for the gas ultimately delivered to the Basin, due to blending of gasses with different WI values that will occur both at the North Baja facilities and within the California gas distribution system itself; and 2) the eventual end-users of the gas in the Basin area and the quantity of gas consumed. Nevertheless, South Coast argues that FERC did not go far enough in its emissions analysis and argues "that substantial and quantifiable details of the proposed gas usage are available to FERC."

This assertion is inconsistent with the position South Coast took in the proceedings before CPUC, where it advocated on

behalf of a 2% deviation from the five-year historical average in California, rather than the 4% deviation that CPUC ultimately adopted, because "the effects of introducing higher WI gas are uncertain, and . . . the two percent band would preserve the status quo while additional research and studies are performed on the environmental effects of burning high WI gas." CPUC agreed with South Coast's assessment "that further research is needed to fully understand the impacts of higher Wobbe Index gas on emissions and end-use equipment performance."

The uncertainty regarding the effects of introducing higher WI gas into the Basin is also reflected in conditions placed by another California agency on the North Baja project. Some additional background is required at this point. FERC's approval was not the only one required here. Because the pipeline's construction required a right-of-way over land owned by the State of California, the California State Lands Commission also had to approve an amendment to North Baja's existing right-of-way lease, and file a statement under the California Environmental Quality Act ("CEQA"), California's equivalent of a NEPA statement. The California State Lands Commission ultimately approved the amendment to the right-of-way, subject to the following condition requiring

> North Baja to study the air quality impacts in the [Basin] of using gas with a higher WI than is presently used in the [Basin]. This condition requires North Baja to measure $NO_x$ emissions directly attributable to any incremental increases in the WI of gas used in the [Basin] resulting from the operation of North Baja's pipeline, to determine appropriate measures to mitigate such increases in $NO_x$ emissions, and to implement those mitigation measures approved by the [California State Lands Commission].

**[5]** In sum, FERC's EIS contains a reasonably thorough discussion of the environmental impact of its actions, based

on information then available to it. Consequently, NEPA's goal of "informed agency action" has been met. *See Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 343 (9th Cir. 1996); *see also Border Power Plant Working Group v. Dep't of Energy*, 467 F. Supp. 2d 1040, 1059 (S.D. Cal. 2006) ("If the EIS contains a reasonably thorough discussion, the court will approve the EIS even though it may disagree with the agency's conclusion." (internal quotation marks omitted)).

## 2.   *The CPUC Proceedings*

Because FERC adopted CPUC gas quality standards, South Coast has launched a collateral attack on those standards in an effort to show that FERC's reliance on them was arbitrary and capricious. CPUC first adopted the standards during proceedings that were commenced based on indications that "there may not be sufficient natural gas supplies or infrastructure to meet the long-term needs of the state[ ]," and at which CPUC determined that liquefied natural gas may prove to be an important new source of natural gas supply to California. CPUC then went on to address the impact of gas quality, expressing "concern[ ] with the potential impacts of high Wobbe gas on emissions," and stating that its goal was "to responsibly determine the impacts of any recommended changes [in WI standards] on safety, end-use performance, and air quality."

Ultimately, CPUC adopted an upper WI limit of 1385 for gas burned in California, lower than the previous allowable maximum of 1437. It found that any air quality impact as a result of a maximum WI limit of 1400 "would be negligible, and at the maximum level of 1385 would be tiny and incremental," and a "1360 maximum Wobbe Index would unnecessarily constrain California's natural gas supplies." Regarding the introduction of liquefied natural gas into California, CPUC also observed that "[t]he truth of the matter is that no one can predict with any certainty what the specific quality of the regasified [gas] will be, when and if it ever

enters California's gas supply system, except to say that it will be within the [CPUC's] permissible Wobbe Index range of 1279-1385."

In reaching the conclusion that the 1385 level was optimal for achieving the dual purposes of supplying natural gas to California at reasonable prices while mitigating any environment damage caused from harmful resulting emissions, CPUC relied on the work of NGC+ Interchangeability Work Group ("NGC+"), an industry-wide technical work group that included representatives of all major segments of the natural gas industry, which was formed to address, *inter alia*, the "interchangeability" issues associated with liquefied natural gas. NGC+ published a paper, dated February 28, 2005, called the "White Paper on Natural Gas Interchangeability and Non-Combustion End Use" ("White Paper"). In the White Paper, NGC+ defines the term "interchangeability" as "[t]he ability to substitute one gaseous fuel for another in a combustion application without . . . materially increasing air pollutant emissions." The stated purpose of the White Paper was "to define acceptable ranges of natural gas characteristics that can be consumed by end users while maintaining safety, reliability, and environmental performance." In light of this purpose, the White Paper recommended the adoption of "[a] range of plus and minus 4%" from the local historical WI average, subject to an overall maximum WI of 1400, along with additional testing.[2]

[6] CPUC rejected the maximum WI level of 1400 as too high, and acknowledged that "[f]urther research is needed to fully understand the impacts of higher [WI] gas on emissions

---

[2]In its official policy statement regarding natural gas interchangeability, FERC explicitly endorsed the NGC+ White Paper, stating that "pipelines and their customers are strongly encouraged to use the Natural Gas Council Plus (NGC+) interim guidelines . . . as a common reference point for resolving gas quality and interchangeability issues." *Natural Gas Interchangeability*, 115 FERC ¶ 61,325, 62,156 (June 15, 2006).

and end-use equipment performance." Moreover, it concluded that developers of liquefied natural gas "need regulatory certainty today to design and build [liquefied natural gas] import projects and arrange for sources of [liquefied natural gas] supply." Accordingly, it concluded that it "should adopt a gas quality standard that is consistent with the best information currently available." In setting new WI levels, CPUC also recognized that factors other than WI may play a large role in protecting California's air quality.

CPUC's observation has proven to be prophetic. Because of the recent discovery of huge natural gas reserves within the United States, which are already being tapped, today "[i]mport terminals for [liquefied natural gas] sit virtually empty, and the prospects that the U.S. will become even more dependent on foreign imports are receding." Amy Myers Jaffe, *Shale Gas Will Rock the World*, Wall St. J., May 10, 2010. This is echoed in a description of the circumstances one year earlier. *See* Ben Casselman, *U.S. Fields Go From Bust to Boom*, Wall St. J., April 30, 2009, at A1 ("Liquefied-natural-gas imports plunged [in 2008], leaving import terminals nearly idle.").[3]

**[7]** Even if CPUC's conclusions were somehow incorrect, however, this fact would not affect our decision regarding FERC, whose reliance on the CPUC findings must simply be reasonable. *See Fuel Safe Wash.*, 389 F.3d at 1332*; Nat'l Parks & Conservation Ass'n*, 222 F.3d at 680. Indeed, in *Fuel Safe Washington v. FERC*, the Tenth Circuit held that FERC's reliance in its EIS on a uniform building code was reasonable, notwithstanding the fact that the EPA and the State of Wash-

---

[3]During oral argument, South Coast's attorney asserted that the current sources of domestic natural gas, the Permian Basin and San Juan Basin, were almost exhausted, and that the only source of natural gas for these areas in the future would be foreign-sourced liquefied natural gas. When asked about the recent large discoveries of domestic natural gas, he disclaimed any knowledge.

ington Department of Natural Resources thought otherwise. 389 F.3d at 1332. Here, the CPUC determination was the product of a lengthy decision making process subject to ample challenges by South Coast. Accordingly, we cannot say that FERC's reliance on these previous state agency findings was in any way unreasonable or an abuse of discretion.

Nor is there any merit to South Coast's claim that CPUC has shirked its responsibility to conduct an environmental analysis of Basin emissions, or that FERC and CPUC are engaged in an "environmentally deceptive game of mutual avoidance." Specifically, South Coast points to statements made by CPUC in 2006, which South Coast now claims illustrate CPUC's belief that FERC is the agency responsible for conducting the appropriate environmental review. This argument, however, mischaracterizes the position taken by CPUC. The statement at issue is taken from the 2006 CPUC order which reduced the maximum WI of gas burned in California from 1437 to 1385. In the course of concluding that this action did not require an environmental impact analysis under California law, CPUC stated:

> It should be noted that, under certain circumstances, the authority to conduct environmental review will lie with agencies and public entities other than the [CPUC]. For example, in 2005, Congress amended the federal [Natural Gas Act] to expressly grant [FERC] the exclusive authority over the siting, construction, expansion or operation of [liquefied natural gas] terminals . . . In addition, if state land would be utilized for [liquefied natural gas] operations, those state or local agencies which administer the use of, and public trust obligations for, such state lands would also retain jurisdiction.

This statement was not a disavowal by CPUC of its obligation to conduct an environmental review of emissions at the proper time—rather, it simply recognizes that, although the exercise

in which it was engaged did not require an environmental analysis, there will be times when other agencies, such as FERC, may conduct environmental reviews *in addition to* those of CPUC. Indeed, as we have already observed, the California State Lands Commission prepared its own environmental impact statement pursuant to CEQA with respect to the North Baja project, and, in approving an amendment to North Baja's right-of-way lease, it reserved the right to exercise continuing control over the quality of gas flowing through the pipeline. As far as the record shows, the adequacy of the CSLC's statement under CEQA was not challenged in California.

Unlike the California State Lands Commission, CPUC was not being asked to approve any aspect of the North Baja pipeline project. Instead, it was engaging in a process which actually lowered the maximum allowable WI of gas burned in California from 1437 to 1385—a determination that, by its very nature, did not constitute an adverse environmental impact and thus, at least on its own, did not require an environmental impact statement. Indeed, CPUC, in its own words, "did not grant any license, permit or approval for any specific gas supply project, and . . . did not authorize the construction or approve siting of any particular new . . . terminals or receiving stations." Rather, it was merely "establish[ing] basic ground rules, including *stricter* gas quality specifications . . . and other terms and conditions of access for any pipeline or gas supply that may connect to California utility systems in the future." (emphasis added). These ground rules "in no way foreclosed the possibility of a future revision to the gas quality standards," and expressly provided an avenue for interested parties to propose modifications to the gas quality specifications if additional future studies suggest that CPUC should revise its standards.

Contrary to South Coast's claim, this record does not evince a scheme of mutual avoidance on the part of FERC and CPUC with regard to the conducting of appropriate envi-

ronmental analysis in California. More significantly, as we have already discussed, the California State Lands Commission not only filed an environmental impact statement, the adequacy of which was never challenged in California, it also conditioned its approval of the right-of-way on its continuing oversight of the quality of the natural gas passing through the pipeline.[4] Rather than evincing a scheme of mutual avoidance, the conduct of the two California administrative agencies and FERC, taken together, illustrate that appropriate environmental analysis was conducted based on the information available.

There is one last observation regarding the proceedings before CPUC. South Coast played a large role in those proceedings, proposing a WI cap of 1360—a 2% difference from CPUC's chosen upper limit. Nevertheless, as FERC observed, "[t]he record contains no analysis or evidence showing a material change in air quality impacts as a result of the consumption of natural gas with a WI of 1385—the upper limit established by the CPUC—compared to that of [South Coast's] proposed WI limit of 1360. Therefore, there is no justification for [South Coast's] proposed two percent band, which would make it more difficult for SoCalGas and end users to find economical gas supplies and therefore could lead to increased consumption of other fuels associated with greater emissions."

### 3.   Collateral Estoppel

FERC argues that South Coast is collaterally estopped from attacking the CPUC determination. This argument is based on the Supreme Court of California's denial of South Coast's petition for review of that determination. *South Coast Air Quality Mgmt. Dist. v. Cal. Pub. Utils. Comm'n*, No. S151156, 2008 Cal. LEXIS 8866 (July 16, 2008). We agree

---

[4]The joint EIS filed by FERC and the California State Lands Commission was deemed by the latter to have complied with CEQA requirements at a meeting held on July 13, 2007.

that a summary denial by the Supreme Court of California "of a petition for review of an order of [CPUC] is a decision on the merits both as to the law and the facts presented in the review proceeding." *People v. W. Air Lines, Inc.*, 268 P.2d 723, 728 (Cal. 1954), *appeal dismissed sub nom*, *W. Air Lines, Inc. v. California*, 348 U.S. 859 (1955). We also agree that, even though FERC was not a party to the proceeding, it may invoke the doctrine of collateral estoppel with respect to both findings of fact and conclusions of law, *see Bernhard v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 122 P.2d 892, 894-95 (Cal. 1942), although as to the latter, "the prior determination is not conclusive either if injustice would result or if the public interest requires that relitigation not be foreclosed," *Consumers Lobby Against Monopolies v. Pub. Utils. Comm'n*, 603 P.2d 41, 47 (Cal. 1979). Nevertheless, based on the foregoing discussion of the CPUC proceedings, it is not necessary for us to address the merits of the collateral estoppel defense.[5]

## B.   *Natural Gas Act*

[8] We now turn to whether FERC violated the Natural Gas Act ("NGA"), which grants FERC the power to authorize interstate pipeline projects. 15 U.S.C. § 717f. When evaluating a proposal for a certificate of public necessity and convenience under NGA Section 7, FERC has acknowledged that it must balance a number of factors to determine "that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience

---

[5]South Coast also contends that the burning of North Baja gas in the Basin is a "connected action." The Council on Environmental Quality regulations provide that the "scope of environmental impact statements . . . shall consider . . . [c]onnected actions, which means that they are closely related and therefore should be discussed in the same impact statement." 40 C.F.R. § 1508.25(a)(1). Because we find that FERC appropriately considered these emissions in its EIS, we need not decide here whether the end use of North Baja gas is a "connected action" within the meaning of 40 C.F.R. § 1508.25(a)(1).

and necessity." 15 U.S.C. § 717f(e). FERC must consider all factors bearing on the public interest consistent with its mandate to fulfill the statutory purpose of the NGA, which is to encourage the development of adequate natural gas supplies at reasonable prices. "Among the factors that [FERC] considers in the balancing process are the proposal's market support, economic, operational, and competitive benefits, and environmental impact." *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61227, 61743 (Sept. 15, 1999). We may uphold FERC's factual determinations under the NGA if supported by "substantial evidence," which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Bear Lake Watch*, 324 F.3d at 1076 (internal quotations omitted).

**[9]** As already discussed, to the extent that the information was available, FERC adequately considered the environmental effects of end-use consumption of North Baja gas when it conditioned its certificate on the pipeline "only deliver[ing] gas that meets the strictest applicable gas quality standards imposed by state regulatory agencies on downstream [local distribution companies] and pipelines." Moreover, FERC determined that, despite South Coast's concerns about air quality, "approval of North Baja's expansion project under the NGA is nevertheless sound policy as it will increase gas supplies, thereby serving to make natural gas more economical, and, consequently, a relatively attractive fuel when compared to more environmentally damaging alternatives." Thus, since "Congress has vested considerable discretion" in FERC under the NGA, "the burden is upon petitioners to show that it has been abused." *Cal. Gas Producers Ass'n v. Fed. Power Comm'n*, 383 F.2d 645, 648 (9th Cir. 1967). Here, FERC determined that approval of the North Baja pipeline project, as conditioned upon compliance with the CPUC's gas quality standards, would serve the public interest. This finding is supported by the substantial evidence discussed above. Accordingly, South Coast has failed to meet its burden of showing that FERC abused its discretion under the NGA.

*C.   Clean Air Act*

**[10]** The Clean Air Act ("CAA") imposes specific require-
ments on federal agencies whose actions may affect state
efforts to attain the national ambient air quality standards.
Under the CAA, if a federal agency's actions will likely result
in "direct" or "indirect" emissions exceeding a certain EPA-
mandated threshold, the agency must prepare a conformity
analysis looking at the effects and must mitigate the project's
emissions. 40 C.F.R. § § 93.150(b), 93.153(a)-(b). FERC
never filed a conformity analysis relating to the North Baja
project, thus we must consider whether the end-use emissions
of the project are either "direct" or "indirect" as defined by
the statute. We review FERC's determinations under the CAA
using the arbitrary and capricious standard. *See Vigil v.
Leavitt*, 381 F.3d 826, 833 (9th Cir. 2004). Because the EPA,
not FERC, is the agency charged with administering the
CAA, FERC's legal interpretations of the Act are reviewed *de
novo. Cal. Trout, Inc. v. FERC*, 313 F.3d 1131, 1133-34 (9th
Cir. 2002).

The EPA's rules define "direct emissions" as emissions of
a criteria pollutant "that are caused or initiated by the Federal
action and occur at the same time and place as the action." 40
C.F.R. § 93.152. "Indirect emissions" are those that

> (1) Are caused by the Federal action, but may occur
> later in time and/or may be farther removed in dis-
> tance from the action itself but are still reasonably
> foreseeable; *and*

> (2) The Federal agency can practicably control and
> will maintain control over due to a continuing pro-
> gram responsibility of the Federal agency.

*Id.* (emphasis added).

Accordingly, our inquiry focuses on whether the emissions
at issue are "indirect emissions" under the statutory definition

supplied by 40 C.F.R. § 93.152. "Unlike the regulations implementing NEPA, the EPA's CAA regulations have defined the term '[c]aused by.' " *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 772 (2004) (alterations in original). Specifically, indirect emissions are "caused by" a Federal action if the "emissions . . . would not . . . occur in the absence of the Federal action." *Id.* (alterations in original); 40 C.F.R. § 93.152. Thus, "for purposes of evaluating causation in the conformity review process, some sort of 'but for' causation is sufficient." *Pub. Citizen*, 541 U.S. at 772. Here, FERC has stated in its order issuing North Baja's certificate that, "but for North Baja's project, vaporized [liquefied natural gas] delivered from the [Baja] Terminal would not be burned by domestic end users" in the Basin. Under these circumstances, FERC's approval of the North Baja pipeline clearly serves as the "but for" cause of downstream emissions resulting from the burning of North Baja gas.

**[11]** Our analysis, however, does not end there. The EPA's rules also require any indirect emissions caused by FERC's authorization to be "reasonably foreseeable," and for FERC to "practicably control" the emissions and "maintain control . . . due to a continuing program responsibility." 40 C.F.R. § 93.152; Pub. Citizen, 541 U.S. at 772. More specifically, the EPA's regulations provide that neither the language of the CAA "nor [EPA's] regulation requires that a federal agency attempt to 'leverage' its legal authority to influence or control nonfederal activities that it cannot practicably control, or that are not subject to a continuing program responsibility, or that lie outside the agency's legal authority." *Determining Conformity of Gen. Fed. Actions to State or Fed. Implementation Plans*, 58 Fed. Reg. 63214, 63221 (1993).

First, South Coast contends that FERC exercises practicable and continuing control over emissions, as evidenced by the fact that FERC imposed conditions on the pipeline project that require North Baja, *inter alia*, to report back to FERC regarding its progress in implementing the conditions. South

Coast further argues that FERC's conditions also require North Baja to conform its precedent agreements with its pipeline shippers in the future. This, South Coast argues, creates a "continuing program responsibility" over emissions on the part of FERC.

FERC's conditions create a requirement that transported gas comply with the WI standards set by CPUC, the agency that has exclusive authority to set such guidelines. The mere fact that North Baja must conform to these standards in the future, however, does not give rise to a "continuing program responsibility" on the part of FERC. Indeed, the condition states that all gas must meet "the strictest applicable gas quality standards imposed by state regulatory agencies." This condition contemplates that such standards may change in the future, and these changes rest in the hands of the appropriate "state regulatory agency"—in this case, CPUC and the California State Lands Commission. Of course, as previously noted, the latter agency included provisions in the amendment to its right-of-way lease that permits it to exercise practicable and continuing control over the quality of gas that flows through the pipeline.

**[12]** Moreover, even if FERC retains continuing control over the burning of North Baja gas, the indirect emissions in this case are not reasonably foreseeable, as FERC reasonably determined in its Rehearing Order. "Reasonably foreseeable" emissions are defined as "projected future indirect emissions that are identifiable at the time the conformity determination is made; the location of such emissions is known and the emissions are quantifiable." 40 C.F.R. § 51.852.

South Coast contends that there was sufficient detail about the North Baja gas project for FERC to analyze the effects of its burning. Specifically, it lists the factors that it claims were available to FERC at the time of its authorization, including: 1) the amount of gas the pipeline will transfer; 2) the purchasers and shippers who will buy the gas; 3) the WI of the gas;

4) the expected $NO_x$ emissions that will result from the gas's consumption; and 5) the environmental harm that will result from that consumption.

This information is significantly less than meets the eye. While the North Baja pipeline has the ability to transport 2.7 billion cubic feet per day, this amount represents its maximum capacity, not the actual amount of gas that it will carry, which will be determined based on its availability and the demand for the gas by end users in Arizona and California—a consideration that may very well be impacted by the extraordinary discoveries of natural gas in the United States. See Jaffe, *supra*. While North Baja has entered into twenty-year precedent agreements with shippers, again, these contracts merely set forth the maximum amount of gas that may be transported using the pipeline, not the amount of gas that will ultimately be shipped.

[13] Moreover, while South Coast correctly states that the gas quality of the North Baja gas "would be up to a 1385 Wobbe Index," this number does not take into account any blending or conditioning of gases that may occur in either the North Baja pipeline itself or the California pipeline system, nor does it reflect the WI of gas in the Basin at the time it is actually burned. Indeed, because the actual WI of the North Baja gas by the time it reaches the Basin is unknown at this time, the expected $NO_x$ emissions and resulting environmental harm that may occur are equally unknown. Again, even South Coast acknowledged this uncertainty during its challenge to the CPUC proceedings. Consequently, the emissions that may result from the consumptive burning of North Baja gas are not reasonably foreseeable within the definition provided by the EPA's regulations.

[14] Because the CAA does not require that FERC attempt to "leverage its legal authority to influence or control" state air quality issues, and because there remains substantial uncertainty regarding the eventual burning of North Baja gas,

FERC is not obligated to perform a full conformity determination regarding such burning under the CAA.

## III.   Conclusion

South Coast's petition for review is denied.