**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PEOPLE OF THE STATE OF
CALIFORNIA EX REL. IMPERIAL
COUNTY AIR POLLUTION CONTROL
DISTRICT; IMPERIAL COUNTY AIR
POLLUTION CONTROL DISTRICT;
COUNTY OF IMPERIAL,
    *Plaintiffs-Appellants*,

v.

U.S. DEPARTMENT OF THE INTERIOR;
SALLY JEWELL, Secretary of the
United States Department of
Interior; UNITED STATES BUREAU OF
RECLAMATION; MICHAEL L.
CONNOR, Commissioner, Bureau of
Reclamation,
    *Defendants-Appellees*,

IMPERIAL IRRIGATION DISTRICT; SAN
DIEGO COUNTY WATER AUTHORITY;
COACHELLA VALLEY WATER
DISTRICT; METROPOLITAN WATER
DISTRICT OF SOUTHERN
CALIFORNIA,
 *Intervenor-Defendants–Appellees*.

No. 12-55856

D.C. No.
3:09-cv-02233-
AJB-PCL

PEOPLE OF THE STATE OF
CALIFORNIA EX REL. IMPERIAL
COUNTY AIR POLLUTION CONTROL
DISTRICT; IMPERIAL COUNTY AIR
POLLUTION CONTROL DISTRICT;
COUNTY OF IMPERIAL,
            *Plaintiffs-Appellees*,

v.

U.S. DEPARTMENT OF THE INTERIOR;
SALLY JEWELL, Secretary of the
United States Department of
Interior; UNITED STATES BUREAU OF
RECLAMATION; MICHAEL L.
CONNOR, Commissioner, Bureau of
Reclamation,
            *Defendants*,

And

IMPERIAL IRRIGATION DISTRICT; SAN
DIEGO COUNTY WATER AUTHORITY;
COACHELLA VALLEY WATER
DISTRICT; METROPOLITAN WATER
DISTRICT OF SOUTHERN
CALIFORNIA,
  *Intervenor-Defendants–Appellants*.

No. 12-55956

D.C. No.
3:09-cv-02233-
AJB-PCL

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Southern District of California
Anthony J. Battaglia, District Judge, Presiding

Argued and Submitted
December 4, 2013—Pasadena, California

Filed May 19, 2014
Amended August 1, 2014

Before: Paul J. Watford and Andrew D. Hurwitz, Circuit
Judges, and William E. Smith, Chief District Judge.[*]

Order;
Opinion by Judge Hurwitz

---

### SUMMARY[**]

**Environmental Law**

The panel amended its opinion, filed May 19, 2014, and
affirmed the district court's summary judgment in favor of
federal defendants and intervenor water districts in an action
challenging an environmental impact statement prepared by
the Secretary of the Interior that analyzed the effects of water
transfer agreements on the Salton Sea in southern California.

The panel disagreed with the district court and held that
the plaintiffs, Imperial County and the Imperial County Air
Pollution Control District, had standing to sue.  The panel

---

[*] The Honorable William E. Smith, Chief District Judge for the U.S.
District Court of the District of Rhode Island, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

nonetheless affirmed the judgment because the district court correctly held in the alternative that the Secretary of the Interior did not violate the National Environmental Policy Act. The panel also held that the record below made plain that the Secretary did not violate the Clean Air Act.

## COUNSEL

Michael L. Rood and Katherine Turner, County of Imperial, County Counsel, El Centro, California, for Plaintiffs-Appellants–Cross-Appellees.

Alene M. Taber (argued), Michael L. Tidus, Kathryn M. Casey, and Jonathan E. Shardlow, Jackson, DeMarco, Tidus, Peckenpaugh, Irvine, California, for Plaintiffs-Appellant–Cross-Appellee People of the State of California ex rel. Imperial County Air Pollution Control District, and Imperial County Air Pollution Control District.

Antonio Rossmann, Roger B. Moore, and Barton Lounsbury, Rossmann and Moore, LLP, San Francisco, California, for Plaintiffs-Appellants–Cross-Appellees County of Imperial.

Ignacia S. Moreno, Assistant Attorney General, David C. Shilton, Stephen M. Macfarlane, Norman L. Rave, Jr., and Peter J. McVeigh (argued), United States Department of Justice, Environment & Natural Resources Division, Washington, D.C.; Robert Snow, M. Rodney Smith, Jr., Office of the Solicitor, United States Department of the Interior, Washington, D.C., for Defendants-Appellees.

Kurt R. Wiese, General Counsel, and Barbara Baird, District Counsel, Diamond Bar, California, for Amicus Curiae South Coast Air Quality Management District.

Catherine Redmond, District Counsel, Fresno, California, for Amicus Curiae San Joaquin Valley Unified Air Pollution Control District.

Katherine C. Pittard, District Counsel, Sacramento, California, for Amicus Curiae Sacramento Metropolitan Air Quality Management District.

Dennis Marshall, County Counsel, and William M. Dillon, Senior Deputy, Santa Barbara, California, for Amicus Curiae Santa Barbara County Air Pollution Control District.

Nancy Diamond, District Counsel, Law Offices of Nancy Diamond, Arcata, California, for Amicus Curiae North Coast Unified Air Quality Management District.

David D. Cooke, Allen Matkins Leck Gamble Mallory & Natsis LLP, San Francisco, California; David L. Osias and Mark J. Hattam, Allen Matkins Leck Gamble Mallory & Natsis LLP, San Diego, California; Jeffrey M. Garber, General Counsel, Imperial Irrigation District, Imperial, California, for Intervenor-Defendant–Appellee–Cross-Appellant Imperial Irrigation District.

Marcia L. Scully, General Counsel, John D. Schlotterbeck, Senior Deputy General Counsel, Adam C. Kear, Senior Deputy General Counsel, Los Angeles, California; Linus Masouredis, Chief Deputy General Counsel, Sacramento, California, for Intervenor-Defendant–Appellee–Cross-

Appellant The Metropolitan Water District of Southern California.

Steven B. Abbott and Julianna Strong, Redwine and Sherrill, Riverside, California; Michelle Ouellette and Melissa R. Cushman, Best Best & Krieger LLP, Riverside California, for Intervenor-Defendant–Appellee–Cross-Appellant Coachella Valley Water District.

Lisabeth D. Rothman and Amy M. Steinfeld, Brownstein Hyatt Farber Schreck, LLP, Los Angeles, California; Daniel S. Hentschke, General Counsel, San Diego County Water Authority, San Diego, California, for Intervenor-Defendant–Appellee–Cross-Appellant San Diego County Water Authority.

---

### ORDER

The opinion filed May 19, 2014, and published at 751 F.3d 1113, is amended as follows:

At slip opinion page 32, in the fourth and fifth textual sentences in the second full paragraph,

Change: "Imperial Irrigation, Imperial County, and the State of California, not the Secretary, will ultimately determine how to allocate the water they receive. If they so choose, they could allocate every acre foot of their Colorado River water to the Salton Sea."

To: "Imperial Irrigation, not the Secretary, ultimately controls the allocation of the water that it receives (subject, of course, to existing laws and contractual obligations)."

At slip opinion page 32, in the first citation sentence in the continuing paragraph,

Change: "§ 93.153(b); Air Rule 925(d)(2)."

To: "§ 93.153(b); Air Rule 925(c)(27), (d)(2), (d)(9)."

We amend the opinion at the suggestion of the Secretary of the Interior and the intervenor defendants because Imperial County and the State of California do not receive water from the Colorado River under water delivery contracts with the Secretary of the Interior. The allocation and use of Colorado River water is of course subject to applicable laws and existing contracts. We also amend the opinion to note that Air Rule 925(d)(9) only applies to the "total of direct and indirect emissions." The superseding amended opinion is filed concurrently with this order.

With these amendments, the panel has voted to deny the appellant's petition for rehearing. Judge Hurwitz and Judge Watford have voted to deny the petition for rehearing en banc. Chief Judge Smith recommends denial of the petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc, and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing is denied and the petition for rehearing en banc is rejected. No further petitions for rehearing or rehearing en banc will be entertained.

**OPINION**

HURWITZ, Circuit Judge:

The Salton Sea—the largest inland body of water in California—is a creature of accident. In 1905, water from the Colorado River breached an irrigation canal and flooded the then-dry Salton Basin. After the initial flood, irrigation runoff from the Imperial and Coachella Valleys—supplied by the Colorado River—sustained the Sea for more than a century. The Sea has become a unique attraction for water-based recreation in the harsh southern California desert.

The Sea's continued access to Colorado River water is in jeopardy. Over the last few decades Arizona and Nevada began to claim their full entitlements to the stream. California, which has long used more than its share, has been required to conserve. The affected California water districts ultimately agreed to transfer some Colorado River water from the Imperial Valley to urban areas in southern California. The Secretary of the Interior—who controls the delivery of River water—prepared an environmental impact statement ("EIS"), which, among other things, analyzed the effect of these agreements on the Salton Sea. Despite noting some potentially serious environmental consequences, the Secretary eventually approved the agreements and implemented a new water delivery schedule.

Plaintiffs Imperial County and the Imperial County Air Pollution Control District (the "Air District") then sued the Secretary, claiming that the EIS did not comply with either the National Environmental Policy Act ("NEPA") or the Clean Air Act ("CAA"). The Imperial Irrigation District ("Imperial Irrigation"), San Diego County Water Authority

("San Diego Water"), Coachella Valley Water District ("Coachella"), and Metropolitan Water District of Southern California ("Metropolitan"), parties to the transfer agreements, intervened as defendants. The district court granted summary judgment to the defendants, finding that neither plaintiff had standing to sue. We disagree as to standing, but nonetheless affirm the judgment, because the district court correctly found in the alternative that the Secretary did not violate NEPA; the record below also makes plain that the Secretary did not violate the CAA.

## I. Background

In 1922, the Colorado River basin states agreed to divide the River's waters among upper- and lower-basin states. Colorado River Compact, 70 Cong. Rec. 324 (1928). In 1928, Congress ratified the compact in the Boulder Canyon Project Act, Pub. L. No. 70-642, 45 Stat. 1057 (codified as amended at 43 U.S.C. §§ 617–619b). California, Arizona, and Nevada are the lower-basin states.

In 1931, various southern California irrigation and water districts agreed to a framework for distributing the State's share of Colorado River water. This "Seven Party Agreement" created seven priorities and—unrealistically assuming an everlasting surplus of river water—divided 5.362 million acre feet per year ("mafy")[1] among the contracting districts. Priorities 1, 2, 3(a), 3(b), 6(a), and 6(b) in the Seven Party Agreement were either unquantified or shared among the districts. Agreement Requesting Apportionment of California's Share of the Waters of the Colorado River Among the Applicants in the State (Aug. 18,

---

[1] An acre-foot of water covers an acre with one foot of water.

1931), *available at* http://www.usbr.gov/lc/region/pao/ pdfiles/ca7pty.pdf. The Secretary and the California districts then incorporated the terms of the Agreement into water delivery contracts. *See* 43 U.S.C. § 617d.

In 1963, the Supreme Court held that the Boulder Canyon Project Act limited California's Colorado River allotment to 4.4 mafy. *Arizona v. California*, 373 U.S. 546, 564–65 (1963). California could exceed this annual allowance only if (1) the other lower-basin states did not use their allotments or (2) there was actually surplus water. *Id.* at 560–61. The Secretary then promulgated regulations defining surplus. *See* 43 C.F.R. pt. 417.

The immediate effects of *Arizona v. California* on California were mitigated, however, because the Secretary designated water as "surplus" rather liberally, proclaiming surpluses when none truly existed. But eventually the Secretary made plain that it was time for California to live within its 4.4 mafy means. In response, the lower-basin states, the California water districts, and the Secretary considered methods to reduce California's dependence on Colorado River water.

In 1998, Imperial Irrigation and San Diego Water reached a preliminary agreement under which Imperial Irrigation would conserve up to 300 thousand acre-feet per year ("kafy") of water, which would then be "transferred" to San Diego Water. In 1999, the Secretary and Imperial Irrigation initiated a joint NEPA and California Environmental Quality Act ("CEQA") study to consider the effects of the proposed

transfer.[2]   Imperial Irrigation District/San Diego County Water Authority Water Conservation and Transfer Project, 64 Fed. Reg. 52,102 (Sept. 27, 1999).  This "Transfer EIS," which is not at issue today, considered off-river impacts of the transfer and possible environmental mitigation measures. *See id.*

In 1999, several water districts negotiated preliminary "Quantification Settlement Agreements" to reduce Colorado River water usage, to quantify and cap Priorities 3 and 6 in the Seven Party Agreement, and to authorize interdistrict transfers of conserved Imperial Irrigation water.   These agreements would have limited Imperial Irrigation's Priority 3(a) to 3.1 mafy.

In 2001, prompted by the proposed Quantification Settlement Agreements, the Secretary announced that she would prepare the EIS challenged here (the "Implementation Agreement EIS") to consider the consequences of delivering a portion of Imperial Irrigation water at different diversion points on the Colorado River for use outside the Imperial Valley. *See* The Implementation Agreement for Secretarial Actions Associated With California Parties' Quantification Agreement, 66 Fed. Reg. 14,211 (Mar. 9, 2001).  The Bureau of Reclamation proposed studying (1) the on-river consequences of changing the points of delivery of up to 400 kafy, (2) the implementation of an overrun accounting and payback policy, and (3) potential biological conservation measures. *Id*.  The Bureau filed a Draft Implementation Agreement EIS and Notice of Availability in January 2002. The comment period for the Draft Implementation Agreement

---

[2] CEQA is the California version of NEPA.  *See* Cal. Pub. Res. Code §§ 21000–21177.

EIS and the Draft Transfer EIS overlapped; after the comment period ended, the Secretary filed both final EISs in November 2002.

The Final Implementation Agreement EIS discussed, among other things, the on-river environmental impacts of altering Colorado River delivery diversion points, the indirect effects of changing the amount of water received by the California districts, and potential mitigation measures to reduce off-river ecological consequences. Because the various proposed mitigation agreements were discussed extensively in the Transfer EIS, the Final Implementation Agreement EIS also summarized and cross-referenced those findings.

In October 2003, the Secretary, Imperial Irrigation, San Diego Water, Metropolitan, and Coachella ratified several revised Quantification Settlement Agreements. Minor changes to the proposed master implementation agreement—the Colorado River Water Delivery Agreement ("CRWDA")—and to proposed environmental mitigation measures had not been discussed in the Final Implementation Agreement EIS. These included an amendment by various districts of water-transfer timelines, a modification by Imperial Irrigation and Coachella of their Salton Sea environmental mitigation plan, and a revision by the Bureau of Reclamation of its proposed species conservation plan after consultation with the Fish and Wildlife Service. The Secretary prepared an environmental evaluation of the modifications, determined that a supplemental EIS was unnecessary, and issued a final record of decision.

This action, in which the plaintiffs allege violations of NEPA and the CAA, ensued. After the water districts

intervened, all parties cross-moved for summary judgment. The district court granted summary judgment to the defendants, holding that plaintiffs lacked Article III standing and alternatively rejecting their NEPA (but not CAA) claims on the merits.  This appeal followed.

## II. Standing

### A. Standard of Review

We review the district court's standing determination de novo.  *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1087 (9th Cir. 2010).  At the summary judgment stage, plaintiffs must identify "specific facts" establishing standing.  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1149 (2013).  We analyze standing claim by claim.  *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996).  We need not address the standing of each plaintiff if we conclude that any plaintiff has standing.  *Nat'l Ass'n of Optometrists & Opticians v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009).

A plaintiff must show a "threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).  If, as here, plaintiffs are not the object of government action or inaction, "standing is not precluded, but it is ordinarily 'substantially more difficult' to establish."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)).

Plaintiffs assert that the Secretary violated NEPA and the Council on Environmental Quality ("CEQ") regulations interpreting it.[3]  Plaintiffs also allege that the Secretary should have made a CAA conformity determination because the CRWDA will expand the Salton Sea's shoreline and thus increase airborne levels of particulate matter with a diameter of ten microns or less ("PM10").  Both alleged injuries are procedural.  Thus, plaintiffs must establish that the Secretary violated procedural rules designed to protect their concrete interests, and that the challenged action will threaten those interests.  *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969–70 (9th Cir. 2003).  For procedural rights, "our inquiry into the imminence of the threatened harm is less demanding," *Hall v. Norton*, 266 F.3d 969, 976 (9th Cir. 2001), and "the causation and redressability requirements are relaxed," *Cantrell v. City of Long Beach*, 241 F.3d 674, 682 (9th Cir. 2001).

### B. Procedural Injury

Plaintiffs established Article III standing.[4]  First, they plainly alleged that the Secretary violated procedural rules.

---

[3] The CEQ regulations interpreting NEPA are "entitled to substantial deference." *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979).

[4] The Secretary does not challenge causation or redressability.  In any event, "plaintiffs asserting procedural standing need not demonstrate that the ultimate outcome following proper procedures will benefit them." *Cantrell v. City of Long Beach*, 241 F.3d 674, 682 (9th Cir. 2001); *see also Natural Res. Def. Council v. Jewell*, No. 09-17661, 2014 WL 1465695, at *6 (9th Cir. Apr. 16, 2014) (en banc).  Both prongs are met here.  Moreover, because the Secretary does not dispute that plaintiffs' claims fall within the "zone of interests" of NEPA and the CAA, that issue is waived. *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1087 n.6 (9th Cir. 2003).

NEPA requires federal agencies to analyze the environmental impacts of their actions, *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756–57 (2004), and the CAA mandates a "conformity determination" when an agency action increases pollutants in nonattainment regions, 42 U.S.C. § 7506(c)(1); 40 C.F.R. § 93.150.  Imperial County argued, both to the agency and in the courts, that the Implementation Agreement EIS was insufficient under NEPA and the CAA.

Second, NEPA and the CAA were designed to protect the plaintiffs' interests.  "NEPA provides that 'local agencies, which are authorized to develop and enforce environmental standards' may comment on the proposed federal action." *Douglas Cnty. v. Babbitt*, 48 F.3d 1495, 1501 (9th Cir. 1995) (quoting 42 U.S.C. § 4332(2)(c)(v)).  Under California law, the Air District may sue on behalf of the State for a violation of the state implementation plan ("SIP").  Cal. Health & Safety Code § 41513.  We have also held that the CAA conformity requirement was designed to protect a sub-state actor's interest in clean air.  *City of Las Vegas v. FAA*, 570 F.3d 1109, 1114, 1117 (9th Cir. 2009).

Third, the challenged action threatens plaintiffs' concrete interests.  A sub-state actor may "sue to protect its own 'proprietary interests' that might be 'congruent' with those of its citizens . . . ." *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011) (per curiam) (quoting *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004)); *see also Douglas*, 48 F.3d at 1500–01.  Those interests are "as varied" as the actors' "responsibilities, powers, and assets." *Sausalito*, 386 F.3d at 1197.

The Environmental Protection Agency ("EPA") has classified Imperial Valley as a serious nonattainment area for

PM10. Plaintiffs provided declarations asserting that the CRWDA will increase PM10 levels, thus risking noncompliance with California's SIP. Failure to comply with the SIP risks a federal enforcement action, loss of highway funds, and mandatory emission offsets. *See* 42 U.S.C. § 7509. Such risks sufficiently demonstrate a threat to concrete interests. *Davis v. EPA*, 348 F.3d 772, 778 (9th Cir. 2003); *see also Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1227–28 (D.C. Cir. 2007); *West Virginia v. EPA*, 362 F.3d 861, 868 (D.C. Cir. 2004).

Plaintiffs also adequately alleged that the Secretary's action will undermine land management in the Imperial Valley. A county's "concrete interests" in its "environment and in land management" can establish Article III standing. *City of Las Vegas*, 570 F.3d at 1114; *see also Sausalito*, 386 F.3d at 1198 (finding a concrete injury because a project would "result in a detrimental increase in traffic and crowds" and affect "municipal management and public safety functions" (quoting *City of Sausalito v. O'Neill*, 211 F. Supp. 2d 1175, 1186 (N.D. Cal. 2002))) (internal quotation marks omitted); *City of Davis*, 521 F.2d at 671 (holding that declarations claiming that agency action "will frustrate the city's policy of 'controlled growth' and render its planning efforts to date obsolete" established a concrete injury).

## C. Identification of Facts

The Secretary claims that plaintiffs did not identify sufficient facts below to establish standing. We reject the argument. Plaintiffs argued below that the CRWDA will increase PM10 levels and undermine the Air District's ability to enforce air quality regulations. Their summary judgment motion included a declaration from the Air Pollution Control

Officer documenting that the CRWDA would increase fugitive dust by expanding the Salton Sea shoreline and thus undermine the Air District's ability to develop an attainment strategy and comply with its SIP.

Plaintiffs also identified specific facts in support of their claim that the Secretary's action will undermine Imperial County's land management. The Planning Director of the Imperial County Land Use Department declared that the project would frustrate the County's land-use plans, reduce its water supply, and impair its housing development. This declaration is no less "specific" than that of the city manager in *Sausalito*, 386 F.3d at 1198–99.

### D. Mechanism of Review

The district court held that plaintiffs lacked standing to assert a CAA claim because they (1) "recharacterized" their complaint as an enforcement action and (2) failed to identify an applicable waiver of sovereign immunity. We disagree.

Plaintiffs' claim arose from the Secretary's alleged CAA violations. The complaint stated that the Secretary's action will increase PM10 levels, interfere with the California SIP, exceed *de minimis* emission thresholds, and be regionally significant. Thus, the complaint asserted, the Secretary should have conducted a conformity determination. Plaintiffs made identical arguments in their summary judgment briefing.

Plaintiffs and the Secretary agree that the Administrative Procedure Act ("APA") is the proper statutory mechanism to challenge the Secretary's action. The APA creates a right of action for persons "suffering legal wrong," 5 U.S.C. § 702,

but provides review only if "there is no other adequate remedy in a court . . . ."  5 U.S.C. § 704.  Although we have not held that the APA authorizes judicial review when an air district asserts a federal conformity violation, we have assumed as much.  *See S. Coast Air Quality Mgmt. Dist. v. FERC*, 621 F.3d 1085, 1099 (9th Cir. 2010); *Sierra Club v. EPA*, 346 F.3d 955, 961, *amended by* 352 F.3d 1186 (9th Cir. 2003); *Pub. Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1020 (9th Cir. 2003), *rev'd on other grounds*, 541 U.S. 752 (2004).  That assumption has solid statutory grounding—the CAA provides a cause of action against a federal agency which violates an "emission standard or limitation under this chapter . . . ."  42 U.S.C. § 7604(a)(1)(A).  As relevant here, an "emission standard or limitation" is in turn defined as "a schedule or timetable of compliance, emission limitation, standard of performance or emission standard." § 7604(f)(1).  The CAA clause requiring a conformity determination, however, is not a schedule or timetable of compliance, an emission reduction, a standard of performance, or an emission limitation.  *Conservation Law Found., Inc. v. Busey*, 79 F.3d 1250, 1257–60 (1st Cir. 1996), *cited with approval by Natural Res. Def. Council, Inc. v. S. Coast Air Quality Mgmt. Dist.*, 651 F.3d 1066, 1072 (9th Cir. 2011).  Judicial review thus is available under the APA, as "no other adequate remedy" exists.  *Id.* at 1260–62; *see also City of Olmsted Falls v. FAA*, 292 F.3d 261, 269 (D.C. Cir. 2002).

The APA also waives the Secretary's sovereign immunity.  Plaintiffs requested declaratory and injunctive relief, and the Act abrogates immunity for actions seeking relief "other than money damages . . . ."  5 U.S.C. § 702; *see also Pub. Citizen*, 316 F.3d at 1032 (ordering equitable relief under the APA for a CAA conformity violation).

## III. NEPA Claims

### A. Standard of Review

"We review de novo the district court's determination that the EIS complies with NEPA and that no [supplemental EIS] was required." *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 523 (9th Cir. 1994). Although the adequacy of an EIS is reviewed for "reasonableness" and the Secretary's no-supplemental-EIS determination for "abuse of discretion," the standards are the same. *Or. Natural Res. Council v. Lowe*, 109 F.3d 521, 528–29 (9th Cir. 1997). Under either rubric, we must decide whether the Secretary took a "hard look" at the environmental consequences of the proposed actions and reasonably evaluated the relevant facts. *Id.* at 526. For issues requiring agency expertise, "we must defer to 'the informed discretion of the responsible federal agencies.'" *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377 (1989) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976)).

### B. Tiering and Incorporation

CEQ regulations encourage agencies to "tier" with a previous EIS to "eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision . . . ." 40 C.F.R. § 1502.20. An agency may tier to a NEPA document, *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 997–98 (9th Cir. 2004), if the subsequent statement is either of "lesser scope" or a "statement or analysis at a later stage." 40 C.F.R. § 1508.28.

The CEQ regulations also require agencies to incorporate by reference NEPA and non-NEPA documents. 40 C.F.R.

§ 1502.21 ("Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action."); *see also* 40 C.F.R. § 1500.4(j) ("Agencies shall reduce excessive paperwork by . . . [i]ncorporating by reference (§ 1502.21)."). Any material incorporated by reference must be "cited in the statement," "briefly described," and "reasonably available for inspection by potentially interested persons," § 1502.21, but need not be physically attached to an EIS, 40 C.F.R. § 1502.18(a) (requiring an appendix to "[c]onsist of material prepared in connection with an environmental impact statement (as distinct from material which is not so prepared and which is incorporated by reference (§ 1502.21))"); Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,034 (Mar. 23, 1981) ("[T]he material which is incorporated by reference does not accompany the EIS.").

Plaintiffs argue that the Final Implementation Agreement EIS either (a) did not clarify whether it incorporated the state Transfer Environmental Impact Report ("EIR") or the federal Transfer EIS, or (b) improperly cited to a non-NEPA document—the Transfer EIR. They are incorrect on both counts.

The Secretary and Imperial Irrigation originally agreed to conduct a joint NEPA and state-CEQA study for the 1998 Imperial Irrigation/San Diego Water transfer agreement. Imperial Irrigation, however, later prepared a separate study in June 2002 (the "Transfer EIR") because CEQA has slightly different reporting requirements than NEPA. The Bureau of Reclamation prepared its own Transfer EIS in November

2002 (the "Final Transfer EIS").[5]    The Secretary then approved a Final Transfer EIS.[6]  Imperial Irrigation District Water Conservation and Transfer Project, California, 67 Fed. Reg. 68,165 (Nov. 8, 2002).

The Final Implementation Agreement EIS clearly distinguished between the Transfer EIR and the Transfer EIS, explaining that "[i]n order to comply with CEQ regulations . . . Reclamation is preparing a fully integrated, stand alone Final EIR/EIS," and incorporating the Transfer EIS by reference.  As plaintiffs note, the Secretary, in an apparent effort to avoid confusion, cited to the Transfer EIR (CEQA version) and the Transfer EIS (NEPA version) as if they were a single document in the Final Implementation Agreement EIS.  But, plaintiffs fail to identify relevant material discussed solely in the Transfer EIR or significant information excluded from the Transfer EIS.[7]  *See Or. Envtl. Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1987) ("The reviewing court may not 'fly speck' an EIS and hold it insufficient on the basis of inconsequential, technical deficiencies.") (quoting *Nw. Indian Cemetery Protective Ass'n v. Peterson*, 795 F.2d 688, 695

---

[5] The Final Transfer EIS incorporated errata revisions, excluded analysis of Habitat Conservation Plan Approach 1, and estimated the Salton Sea's exposed shoreline for Alternatives 2 and 3.

[6] The Secretary's record of decision for the Implementation Agreement EIS stated that "this ROD is not based on [the Transfer EIR/EIS]."  That statement is consistent with the Secretary's position that she incorporated the Transfer EIS's discussion of the Salton Sea impacts but did not "tier to" it.

[7] Plaintiffs note that the Transfer EIR and Transfer EIS have different assessments of the impact that changes in water delivery will have on the Salton Sea's shoreline.  But plaintiffs fail to identify any flaw in the Transfer EIS assessment.

(9th Cir. 1986)).  And although the Secretary once cited the Transfer EIR and Transfer EIS as a single document in her district court briefing, that minor misstatement does not prejudice our review.**[8]**

Plaintiffs next argue that the Secretary improperly tiered to "19 non-NEPA documents," citing to ten pages in the Implementation Agreement EIS.  These "non-NEPA documents" are federal statutes, state environmental impact reviews, and EISs from other Colorado River projects; they are cited to provide a "road map" of Colorado River programs, not to sidestep the Secretary's NEPA obligations. The Implementation Agreement EIS at most incorporated these documents, which are properly "cited in the statement," "briefly described," and "reasonably available for inspection by potentially interested persons."  § 1502.21

More specifically, plaintiffs argue that the Final Implementation Agreement EIS cited to the Coachella Valley Water Management Plan Program EIR, which was not released for public review during the comment period for the Implementation Agreement EIS.**[9]**  However, a final EIS may

---

**[8]** Because the Implementation Agreement EIS incorporated only the Transfer EIS, we need not consider the Transfer EIR's alleged shortcomings.  Plaintiffs also argue that the Secretary never made a record of decision for the Transfer EIS.  This argument was waived, as it was not made below or in the opening brief.  *Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851, 858 n.4 (9th Cir. 1999).  Moreover, any such failure would not prevent the Secretary from incorporating the Transfer EIS by reference into the Implementation Agreement EIS.

**[9]** Plaintiffs also assert that a number of cited documents were not publicly available.  The assertion is belied by the public record.  *See* Imperial Irrigation District Water Conservation and Transfer Project, 67 Fed. Reg. at 68,165; Imperial Irrigation District Water Conservation

include information not cited in a draft; recirculation is required only if there is significant new information or circumstances relating to the proposed action. *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 873 (9th Cir. 2004) (citing 40 C.F.R. § 1502.9(c)(1)(ii)). The Secretary cited the Coachella Valley Water Management Program EIR only to respond to comments from the Bureau of Indian Affairs and to further discuss secondary environmental consequences of the CRWDA, not to identify a new proposal or to describe previously unconsidered environmental consequences. Plaintiffs' interpretation of NEPA would require an agency to submit a new draft EIS or supplemental EIS for any update, regardless of its significance. Every draft EIS would then be, in effect, a final EIS.

Plaintiffs next argue that the Implementation Agreement EIS improperly stated that it "tiers to and incorporates by reference" the Quantification Settlement Agreement Program EIR and the Coachella Valley Water District Management Plan Program EIR. The Secretary would indeed have erred if she had tiered to these documents, as they are state environmental reports, not NEPA documents. *Klamath-Siskiyou*, 387 F.3d at 997–98. However, the Secretary's "tiers to" language is a scrivener's error. The non-NEPA documents were plainly incorporated by reference, and accidently referring to a document as "tiered to and

---

and Transfer Project, Draft Habitat Conservation Plan, California, 67 Fed. Reg. 3732 (Jan 25, 2002); Quantification Settlement Agreement Final PEIR Preface at 2 (June 2002) ("The Draft PEIR was released for public review on January 30, 2002."); Coachella Valley Final Water Management Plan § 1-5 (Sept. 2002) ("The draft PEIR was released to all interested public agencies and individuals for review and comment for a 45-day review period that concluded on August 9, 2002.").

incorporated" rather than just "incorporated" is harmless. *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659 (2007) (declining to remand when an agency made a "stray statement, which could have had no effect on the underlying agency action being challenged").

Finally, Plaintiffs argue that *Pacific Rivers Council v. United States Forest Service*, 689 F.3d 1012 (9th Cir. 2012), requires all discussion of environmental impacts to be in the text of an EIS, rather than incorporated by reference. Plaintiffs also contend that the Secretary too heavily incorporated indirect impact analysis when discussing the Salton Sea. Our *Pacific Rivers* opinion, however, was vacated as moot, 133 S. Ct. 2843 (2013), and, in any event, provides little help. The court there determined that a Forest Service supplemental EIS failed to discuss the impact of logging on individual species of fish. *Pac. Rivers*, 689 F.3d at 1029–30. The Forest Service attempted to "save" the supplemental EIS by claiming that it had incorporated two biological assessments which discussed these impacts. Those assessments, however, were not "described and analyzed in the text" of the supplemental EIS, contained "no analysis . . . of the manner or degree to which the alternatives may have affected these fish," and "applied to only one group of fish species." *Id.* at 1031–32. Unlike the Forest Service's supplemental EIS in *Pacific Rivers*, the text of the Implementation Agreement EIS extensively considered the environmental effects that the CRWDA will have on the Salton Sea.

## C. Segmenting

Plaintiffs next argue that the Secretary improperly "segmented" the Quantification Settlement Agreements by

preparing two EISs.  "Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement."  40 C.F.R. § 1502.4(a).  To prevail, plaintiffs must show that the Secretary acted arbitrarily by not preparing a single EIS.  *Kleppe*, 427 U.S. at 412 ("Resolving these issues requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies.").  "We apply an 'independent utility' test to determine whether multiple actions are so connected as to mandate consideration in a single EIS.  The crux of the test is whether 'each of two projects would have taken place with or without the other and thus had independent utility.'"  *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 969 (9th Cir. 2006) (quoting *Wetland Actions Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1118 (9th Cir. 2000)).

The Secretary did not act arbitrarily by separately preparing a Transfer EIS and an Implementation Agreement EIS.  The Implementation Agreement EIS analyzed the on-river effects of altering the Colorado River diversion points, and the Transfer EIS considered a separate water-transfer agreement among the districts and proposed habitat conservation programs.  The Secretary did not prepare two EISs to "avoid consideration of an entire action's effects on the environment."  *W. Radio Servs. Co. v. Glickman*, 123 F.3d 1189, 1194 (9th Cir. 1997).  Rather, the Implementation Agreement EIS considered both the on-river impact of changing the Colorado River diversion points and the secondary, off-river consequences of reducing Imperial Irrigation's water.

## D. Supplemental EIS

The Secretary also did not abuse her discretion by concluding that a supplemental EIS was unnecessary. A supplemental EIS is required if (a) the "agency makes substantial changes in the proposed action that are relevant to environmental concerns;" or (b) there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c). But, "supplementation is not required when two requirements are satisfied: (1) the new alternative is a '*minor variation* of one of the alternatives discussed in the draft EIS,' and (2) the new alternative is '*qualitatively within the spectrum of alternatives* that were discussed in the draft [EIS].'" *Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1045 (9th Cir. 2011) (alteration in original) (quoting Forty Most Asked Questions, 46 Fed. Reg. at 18,035).

We defer to the Secretary's decision not to prepare a supplemental EIS when, as here, the "new alternative" is a third-party plan to mitigate environmental impacts. As the Supreme Court has explained, although an agency must provide a "reasonably complete discussion of possible mitigation measures," there is no "substantive requirement that a complete mitigation plan be actually formulated and adopted . . . ." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989). When federal action ultimately depends on "state and local governmental bodies that have jurisdiction over" the mitigation measures, "it would be incongruous to conclude that the [federal agency] has no power to act until the local agencies have reached a final conclusion on what mitigating measures they consider necessary." *Id.* at 352–53. Accordingly, a supplemental EIS

is unnecessary when an agency's final decision falls "within the range of alternatives" considered in an EIS. *Russell Country Sportsmen*, 668 F.3d at 1046.

Plaintiffs argue that a supplemental EIS was required after the water districts altered their proposed Salton Sea Habitat Conservation Strategy ("SSHCS"). Under the originally proposed SSHCS, the Salton Sea could have received mitigation water directly from the Colorado River until 2030. The water districts instead ultimately agreed to decrease over time the amount of water transferred from Imperial Irrigation, rather than provide direct "mitigation water" to the Sea. Although the Implementation Agreement EIS did not consider this exact mitigation mechanism, it did consider the consequences of providing the Salton Sea with no mitigation water at all. The changes to the SSCHS thus: (1) were qualitatively considered through a no-mitigation alternative; (2) were a secondary aspect of the Implementation Agreement EIS; (3) reduced overall an adverse environmental impact; and (4) did not alter the project's cost-benefit analysis. *Russell Country Sportsmen*, 668 F.3d at 1048–49.

Two other post-EIS changes discussed by plaintiffs—modifications to the water sell and payback programs—are moot, as they were scheduled to occur in 2006, 2009, and 2012. *See Headwaters, Inc. v. Bureau of Land Mgmt.*, 893 F.2d 1012, 1015–16 (9th Cir. 1990). And, plaintiffs' claim that the Implementation Agreement EIS did not recognize that the CRWDA will reduce Imperial Irrigation's water up to 575.2 kafy in 2017—rather than 300 kafy—assumes water "loss" from prior water exchanges and conservation measures not at issue here.

Plaintiffs also argue that the Implementation Agreement EIS relied on the original SSHCS alone to reduce species loss at the Salton Sea, while the Secretary instead ultimately requested a biological assessment from the Fish and Wildlife Service and "adopted" an Endangered Species Act ("ESA") Section 7 approach.  Section 7(a)(2) of the ESA requires consultation with the Fish and Wildlife Service to ensure that an action will not jeopardize listed species or their designated habitat.      16 U.S.C. § 1536.      "Once Section 7(a)(2) consultation is complete, the FWS or the Service must provide the agency with a written biological opinion 'setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat.'" *Jewell*, 2014 WL 1465695, at *2 (quoting § 1536(b)(3)(A)). The Implementation Agreement EIS discussed using *either* the SSHCS or Section 7 to mitigate environmental harm in and around the Salton Sea.  The Secretary initiated Section 7 consultations because it appeared that Imperial Irrigation would not agree to all of the terms in the proposed SSHCS. Because any mitigation strategy ultimately depended on "state and local governmental bodies," it would be "incongruous" to conclude that the Secretary erred by discussing the environmental impacts of using a SSCHS, Section 7, or no-mitigation approach in the Implementation Agreement EIS.  *Robertson*, 490 U.S. at 352.  And, given the Secretary's consideration of the project's environmental impacts without mitigation, adopting the Section 7 approach in the environmental evaluation fell within the "range" of options that the Secretary had previously considered. *Russell Country Sportsmen*, 668 F.3d at 1046.

Plaintiffs further contend that the Implementation Agreement EIS and record of decision failed to discuss

potential mitigation measures.  An EIS must contain "a reasonably complete discussion of possible mitigation measures," *Robertson*, 490 U.S. at 352, and a record of decision must state whether "all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not." 40 C.F.R. § 1505.2(c).  The Implementation Agreement EIS and the Secretary's record of decision sufficiently considered potential mitigation measures.

In the alternative, plaintiffs claim that the Secretary abused her discretion by using an "environmental evaluation"—a memorandum made available to the public—rather than an environmental assessment, to explain her decision not to prepare a supplemental EIS.  But CEQ regulations do not dictate the form that an agency must use when deciding whether to prepare a supplemental EIS, and we have approved the use of various documents.  *Idaho Sporting Cong. Inc. v. Alexander*, 222 F.3d 562, 565–66 (9th Cir. 2000) (endorsing the use of supplemental information reports, reevaluations, memorandums of record, and secretary issue documents).  Moreover, the Secretary did not err by writing the environmental evaluation without prior public input, as "there is no such requirement for the decision *whether* to prepare [a supplemental EIS]."  *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000).

### E. Alternatives

The Secretary's decision to discuss only one alternative—no action—was not arbitrary and capricious. NEPA regulations require an EIS to "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study,

briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). Whether the Secretary evaluated all reasonable alternatives depends on the "stated goal of a project." *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). "This is all NEPA requires—there is no minimum number of alternatives that must be discussed." *Laguna Greenbelt*, 42 F.3d at 524.

The Implementation Agreement EIS only compared the CRWDA to a no action alternative because the CRWDA is a negotiated agreement. Discussing a hypothetical alternative that no one had agreed to (or would likely agree to) would have been unhelpful, and as a result, the Implementation Agreement EIS reasonably compared a hard-fought negotiated agreement to no agreement at all.

In any event, the Implementation Agreement EIS properly compared the future environmental consequences of no action to the effects of the CRWDA. An agency must consider a no action alternative when discussing the effects of a proposed project. § 1502.14(d). "The 'no action' alternative may be thought of in terms of continuing with the present course of action until that action is changed." *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1188 (9th Cir. 1997) (quoting Forty Most Asked Questions, 46 Fed. Reg. at 18,027). The Secretary acted reasonably by creating a model to compare the predicted conditions at the Salton Sea under the CRWDA with "no action."

### F. Air Quality

The Implementation Agreement EIS also took the required "hard look" at the air quality impacts from the project. "A 'hard look' should, of course, involve the

discussion of adverse impacts.  A 'hard look' does not dictate a soft touch or brush-off of negative effects." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1241 (9th Cir. 2005).  An agency must also "acknowledge and respond to comments by outside parties that raise significant scientific uncertainties and reasonably support that such uncertainties exist." *The Lands Council v. McNair*, 537 F.3d 981, 1001 (9th Cir. 2008) (en banc).

The Implementation Agreement EIS discussed the impact that the CRWDA will have on air quality, responded to EPA concerns about the Salton Sea's shoreline, and incorporated by reference the detailed air quality discussion in the Transfer EIS.  That was sufficient. *Lands Council*, 537 F.3d at 1001.[10]

## G. Reclamation Project

The Implementation Agreement EIS sufficiently discussed the relationship between the CRWDA and the Salton Sea reclamation project.  An EIS must discuss a project's interaction with "other environmental laws and policies."   40 C.F.R. § 1502.2(d).   The Salton Sea Reclamation Act of 1998 required the Secretary to conduct a feasibility study on "various options that permit the continued use of the Salton Sea" by January 1, 2000.  Pub. L. No. 105-372, § 101, 112 Stat. 3377, 3378.  The Secretary reasonably noted that a reclamation project can proceed with or without the CRWDA.

---

[10] Plaintiffs cite a letter and a deposition transcript from a consultant. Neither, however, was submitted to the Secretary when she was drafting the EIS.  *See Pub. Citizen*, 541 U.S. at 764–65.

## H. Growth

An EIS must consider "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b). The Secretary adequately considered how the CRWDA will interact with southern California land use, population density, and economic growth.

## IV. Clean Air Act Claims

Plaintiffs argue that the Secretary should have performed a CAA conformity determination because the CRWDA will expand the Salton Sea's shoreline and thus increase PM10 levels. In light of its standing ruling, the district court did not consider this claim. But when we review a final agency action with a complete record, we may address this argument in the first instance, *City of Davis*, 521 F.2d at 673, and we conclude that the Secretary did not violate the CAA.

The CAA "conformity provision" requires that no federal agency "shall engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to an implementation plan after it has been approved or promulgated under section 7410 of this title." 42 U.S.C. § 7506(c)(1). The EPA has adopted rules identifying when an agency must conduct a full-scale conformity determination, 40 C.F.R. § 93.153, but also has allowed state implementation plans to include "criteria and procedures for assessing conformity of Federal actions," as long as those "provisions apply equally to non-Federal as well as Federal entities," 40 C.F.R. § 51.851(a), (e). Imperial Air District adopted, and the EPA approved, such a

conformity rule: Imperial County Air Pollution Control District Rule 925.      Approval and Promulgation of Implementation Plans for Arizona and California; General Conformity Rules, 64 Fed. Reg. 19,916, 19,917 (Apr. 23, 1999).  Although we have twice applied federal rules in CAA cases against federal agencies, *S. Coast Air Quality*, 621 F.3d at 1099–1100; *City of Las Vegas*, 570 F.3d at 1117, under either rule, the outcome here is the same.

Neither the federal nor the state rule identify the form an agency must use when deciding whether a project necessitates a full-scale conformity determination.  Here, the Secretary announced her decision that a conformity determination was unnecessary in the Implementation Agreement EIS.  An agency need not prepare a stand-alone document explaining such a decision.  *City of Las Vegas*, 570 F.3d at 1113, 1117 (approving use of a "Finding of No Significant Impact" to explain why a CAA conformity determination was unnecessary); *see also Tinicum Twp., Pa. v. U.S. Dep't of Transp.*, 685 F.3d 288, 294 (3d Cir. 2012) (approving a conformity determination located in an EIS).

Both the federal and state rules require a full-scale conformity determination "where the total of direct and indirect emissions of the criteria pollutant" exceeds a certain level. § 93.153(b); Air Rule 925(c)(27), (d)(2), (d)(9).  Under both rules, "direct emissions" only include emissions that "occur at the same time and place as the action."  40 C.F.R. § 93.152; Air Rule 925(c)(7).  And, both rules define indirect emissions as being (1) caused by federal action but occurring at a different time or place as the action, (2) reasonably foreseeable, (3) practically controlled by the agency, and (4) under the continuing program responsibility of the agency.  § 93.152; Air Rule 925(c)(16).

The Secretary did not abuse her discretion by concluding that actions by the Interior Department will not directly cause PM10 emissions. The CRWDA only commits the Secretary to changing the delivery point of Colorado River water. The Secretary's real actions thus occur at the Parker and Imperial Dams; any Salton Sea PM10 emissions would be far from those diversion points.

Nor did the Secretary abuse her discretion in finding that the project will not indirectly increase PM10 emissions. In the absence of a new water delivery agreement, the Salton Sea might decline at a slower rate. However, any resulting emissions would not be "practicably controlled" by the Secretary. *See* § 93.152; Air Rule 925(c)(16). Imperial Irrigation, not the Secretary, ultimately controls the allocation of the water that it receives (subject, of course, to existing laws and contractual obligations). *See S. Coast Air Quality*, 621 F.3d at 1099–1101 (finding no practical control when a state ultimately causes the emissions); Determining Conformity of General Federal Actions to State or Federal Implementation Plans, 58 Fed. Reg. 63,214, 63,221 (Nov. 30, 1993) ("The EPA does not believe that Congress intended to extend the prohibitions and responsibilities to cases where, although licensing or approving action is a required initial step for a subsequent activity that causes emissions, the agency has no control over that subsequent activity . . . .").

## V. Conclusion

For the foregoing reasons, we **AFFIRM** the judgment of the district court.