**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES; IDAHO SPORTING CONGRESS; NATIVE ECOSYSTEMS COUNCIL,<br><br>*Plaintiffs-Appellants*,<br><br>v.<br><br>UNITED STATES FOREST SERVICE; THOMAS TIDWELL, Chief of the Forest Service; KEITH LANNOM, Forest Supervisor for Payette National Forest; NORA RASURE, Regional Forester for Region 4 for the U.S. Forest Service,<br><br>*Defendants-Appellees*,<br><br>and<br><br>ADAMS COUNTY, a political subdivision of the State of Idaho; PAYETTE FOREST COALITION, an unincorporated Idaho association,<br>*Intervenor-Defendants-Appellees*. | No. 16-35829<br><br>D.C. No.<br>1:15-cv-00193-EJL<br><br><br>OPINION |

Appeal from the United States District Court
for the District of Idaho
Edward J. Lodge, District Judge, Presiding

Argued and Submitted February 5, 2018
Seattle, Washington

Filed August 13, 2018

Before:  Milan D. Smith, Jr. and Mary H. Murguia, Circuit
Judges, and Eduardo C. Robreno,[*] District Judge.

Opinion by Judge Murguia

### SUMMARY[**]

### Environmental Law

The panel affirmed in part and reversed in part the
district court's summary judgment in favor of the U.S. Forest
Service and intervenors Adams County, Idaho and Payette
Forest Coalition, and remanded, in an action alleging that the
Forest Service violated environmental laws in connection
with the 2003 Payette National Forest Land and Resource
Management Plan and the Lost Creek Project.

The 2003 Forest Plan divided the Payette Forest into
"management areas;" and the land within each management
area was assigned to various categories – called
Management Prescription Categories ("MPC") – that
determined how the land was managed. In 2011, the Forest

---

[*] The Honorable Eduardo C. Robreno, United States District Judge
for the Eastern District of Pennsylvania, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It
has been prepared by court staff for the convenience of the reader.

Service proposed Wildlife Conservation Strategy ("WCS") amendments, and prepared a draft environmental impact statement; but the WCS amendments were never adopted. In 2014, the Forest Service approved the Lost Creek Project, which proposed landscape restoration activities on approximately 80,000 acres of the Payette National Forest.

Reversing the district court, the panel held that the final 2014 Record of Decision for the Lost Creek Project, which eliminated MPC 5.2 (commodity production) in its entirety and replaced it with MPC 5.1 (restoration), was arbitrary and capricious because the standards, guidelines, and desired conditions that determined the forest conditions for MPC 5.1 were different from those for MPC 5.2. Specifically, the panel held that: the switch from MPC 5.2 to MPC 5.1 improperly resulted in the loss of binding Fire Standard 0312 under the existing Forest Plan; the elimination of the existing Fire Guideline 0313 was contrary to the Forest Plan; and the switch resulted in the imposition of new desired vegetative conditions with the potential to alter the landscape and was inconsistent with the Forest Plan. The panel concluded that the switch from MPC 5.2 to MPC 5.1 constituted a violation of the National Forest Management Act.

Reversing the district court, the panel held that the Forest Service's decision to adopt a new definition of "old forest habitat" for the Lost Creek Project area was arbitrary and capricious, and a violation of the National Forest Management Act.

Affirming the district court, the panel held that the Lost Creek Project's minimum road system designation was not arbitrary or capricious where the Forest Service fully explained its decision in selecting an alternative and considered each of the factors listed under 36 C.F.R. § 212.5.

The panel affirmed the district court's conclusion that the Forest Service did not violate the National Environmental Policy Act by improperly incorporating – or "tiering to" – the WCS amendments or the WCS draft environmental impact statement.

The panel held that plaintiffs' challenge to the Forest Service's failure to reinitiate consultation with the U.S. Fish and Wildlife Service for the endangered bull trout under Section 7 of the Endangered Species Act was moot in light of the Forest Service's decision to reinitiate consultation for the bull trout over its entire range, including the Payette National Forest. The panel vacated the district court's decision on this claim.

The panel instructed the district court to vacate the Forest Service's September 2014 Record of Decision and remand to the Forest Service for further proceedings.

**COUNSEL**

Claudia M. Newman (argued) and Jacob Brooks, Bricklin & Newman LLP, Seattle, Washington, for Plaintiffs-Appellants.

Allen M. Brabender (argued), Sean C. Duffy, and Bridget Kennedy McNeil, Attorneys; Jeffrey H. Wood, Acting Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; Kenneth D. Paur, Office of the General Counsel, Department of Agriculture, Golden, Colorado; for Defendants-Appellees.

Lawson E. Fite (argued), American Forest Resource Council, Portland, Oregon, for Intervenor-Defendants-Appellees.

**OPINION**

MURGUIA, Circuit Judge:

This case requires us to determine whether the Forest Service's management direction for a particular section of Idaho's Payette National Forest is consistent with the management direction that governs the forest as a whole. In September 2014, the United States Forest Service approved the Lost Creek-Boulder Creek Landscape Restoration Project ("Lost Creek Project" or "Project"), which proposed landscape restoration activities on approximately 80,000 acres of the Payette National Forest. Following approval of the Project, Plaintiffs-Appellants the Alliance for the Wild Rockies, Idaho Sporting Congress, and Native Ecosystems Council (collectively, "Alliance") filed suit in federal court, claiming Defendants-Appellees United States Forest Service, Thomas Tidwell, Keith Lannom, and Nora Rasure (collectively, "Forest Service") violated the National Forest Management Act ("NFMA") by failing to adhere to the requirements of the 2003 Payette National Forest Land and Resource Management Plan ("the Payette Forest Plan" or "the 2003 Plan"). The 2003 Plan governs management decisions on all land within the Payette National Forest, including the Lost Creek Project. Specifically, the Alliance claimed that the Forest Service acted inconsistently with the Payette Forest Plan, in a manner that would harm certain habitat within the forest, when it created a new definition for "old forest habitat" and designated certain land to be managed for landscape restoration, as opposed to

commodity production. According to the Alliance, although the Lost Creek Project espoused certain environmental benefits, the upshot of these decisions would be an increase in commercial logging and a decrease in habitat protected as "old forest." The Alliance also claimed the Forest Service violated the National Environmental Policy Act ("NEPA") by improperly incorporating the analysis of—or "tiering to"—prior agency documents that did not undergo a full NEPA review. Finally, the Alliance claimed the Forest Service violated the Endangered Species Act ("ESA") by failing to reinitiate consultation with the United States Fish and Wildlife Service regarding the effects on critical habitat for the bull trout.

In its present appeal, the Alliance challenges the district court's grant of summary judgment in favor of the Forest Service and Intervenor-Defendants-Appellees Adams County and the Payette Forest Coalition (collectively, "Adams County"). We have jurisdiction under 28 U.S.C. § 1291. We affirm in part and reverse and remand in part.

## I. Statutory & Factual Background

### A. The NFMA

The NFMA charges the Forest Service with the management of national forest land, including planning for the protection and use of the land and its natural resources. *See* 16 U.S.C. § 1600 *et seq.* Under NFMA, forest land management occurs on two levels: (1) the forest level, and (2) the individual project level. *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012). "On the forest level, the Forest Service develops a Land and Resource Management Plan (forest plan), which consists of broad, long-term plans and objectives for the entire forest." *Id.* The forest plan is then implemented at the project level.

*See id.* Site-specific projects and activities must be consistent with an approved forest plan. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.15(b); *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 961 (9th Cir. 2005) ("It is well-settled that the Forest Service's failure to comply with the provisions of a Forest Plan is a violation of NFMA."); *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 962 (9th Cir. 2002) ("[A]ll management activities undertaken by the Forest Service must comply with the forest plan, which in turn must comply with the Forest Act . . . ."). In its project approval document, the agency must describe how the project is consistent with the forest plan. 36 C.F.R. § 219.15(d). A project is consistent if it conforms to the applicable "components" of the forest plan, including the standards, guidelines, and desired conditions that are set forth in the forest plan and that collectively establish the details of forest management. Consistency under agency regulations depends upon the component type. The Forest Service must strictly comply with a forest plan's "standards," which are binding limitations, but it may deviate from the forest plan's "guidelines," so long as the project is "as effective [as the forest plan] in achieving the purpose of the applicable guidelines." *Id.* § 219.15(d)(3). When a site-specific project is not consistent with the applicable forest plan components, the Forest Service must either modify or reject the proposed project, or amend the plan. *Id.* § 219.15(c).

## B. NEPA

"NEPA is a procedural statute that requires the federal government to carefully consider the impacts of and alternatives to major environmental decisions." *Weldon*, 697 F.3d at 1051. "The National Environmental Policy Act has twin aims. First, it places upon [a federal] agency the

obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002) (alteration in original) (internal quotation marks and citation omitted). "NEPA requires agencies to take a 'hard look' at the environmental consequences of proposed agency actions before those actions are undertaken." *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1215 (9th Cir. 2017) (citation omitted).

## C. The Payette National Forest

The Payette National Forest contains approximately 2,300,000 acres of national forest system lands in west central Idaho. The region is 87% forested and contains portions of the Salmon, Payette, and Weiser River systems and parts of the Salmon River Mountains. It is home to many species, including the threatened bull trout.

The Payette National Forest is managed in accordance with the 2003 Payette Forest Plan, pursuant to the NFMA. Emphasizing restoration and maintenance of vegetation and watershed conditions, the 2003 Plan divides the Payette Forest into 14 sections that are called "management areas" ("MA"). The land within each MA is assigned to various categories that determine how the land is managed. These categories are called Management Prescription Categories ("MPC"). The categories range from "Wilderness" (MPC 1.0) to "Concentrated Development" (MPC 8.0).

Relevant here, MPC 5.1 places an emphasis on landscape restoration in order to provide habitat diversity, reduced fire risk, and "sustainable resources for human use." Timber

harvest may occur on MPC 5.1 land, as an outcome of maintaining resistance to fire, but timber yield is not the primary purpose. MPC 5.1 constitutes 193,000 acres of the Payette Forest under the Payette Forest Plan. In contrast, MPC 5.2 is forested land that has an emphasis on achieving sustainable resources for commodity outputs, such as timber production. MPC 5.2 constitutes 247,000 acres under the 2003 Plan.

In 2011, the Forest Service proposed amendments to the Payette Forest Plan. The proposed amendments, which were called the Wildlife Conservation Strategy ("WCS"), would prioritize activities that would help maintain or restore habitat for certain species of wildlife that the Forest Service determined were in greatest need of conservation. Relevant here, the WCS amendments proposed deleting MPC 5.2 (commodity production) in its entirety, and replacing it with MPC 5.1 (restoration).[1] The WCS amendments also proposed changes to Appendix E of the 2003 Payette Forest Plan, to include a new criteria for defining "Old Forest Habitat," a designation that refers to older habitat marked by large trees and which is particularly good habitat for wildlife. The Forest Service released a draft environmental impact statement ("WCS DEIS") for the proposed amendments pursuant to NEPA. However, following the public comment period on the WCS DEIS, the Forest Service stopped the process, and the WCS amendments were never adopted, leaving the 2003 Payette Forest Plan fully in effect.

---

[1] The switch to a restoration emphasis under MPC 5.1 reflected the Forest Service's desire to improve habitat conditions for certain species, including the white-headed woodpecker, but, according to the Alliance, did not necessarily benefit other ESA-listed species. The switch to MPC 5.1 also resulted in increased land authorized for commercial and non-commercial logging.

According to the Alliance, the WCS amendments, including the switch from MPC 5.2 to MPC 5.1 and the new definition of "Old Forest Habitat," were controversial policies that paved the way for logging more trees.

### D. The Lost-Creek Project

In 2012, the Forest Service initiated the Lost Creek Project, which proposed landscape restoration activities on approximately 80,000 acres of the Payette National Forest, including commercial and non-commercial logging, prescribed fires, road closures, and recreation improvements. The Project area spans three management areas, MA3 (Weiser River), MA4 (Rapid River), and MA5 (Middle Little Salmon River), and includes land designated for "restoration" (MPC 5.1) and "commercial production" (MPC 5.2) under the 2003 Plan. In the Project's final environmental impact statement ("Project FEIS") published in March 2014, the Forest Service states that the purpose of the Project is to move vegetation toward the Forest Plan's "desired conditions," which are those conditions deemed desirable to achieve the specific purpose for each MPC. The FEIS further states that the Project is "consistent with the science in the Forest's [WCS DEIS]," which includes improving habitat for species of concern, maintaining and promoting large tree forest structure and forest resiliency, and reducing the risk of undesirable wildland fire. The Project also aims to restore certain streams, with an emphasis on restoring habitat occupied by ESA-listed species, such as the bull trout.

In September 2014, the Forest Service entered the final record of decision (ROD) for the Lost Creek Project, selecting, from the five alternatives discussed in the FEIS, a modified version of Alternative B, which implemented recreation improvement, road management, watershed

restoration, and vegetation management, including 22,100 acres of commercial logging and approximately 17,700 acres of non-commercial logging. In the ROD, the Forest Service also approved a "minimum road system" for the Project, decommissioning approximately 68 miles of roads and designating 401 miles of roads for maintenance or improvement in the Project area.

In June 2015, the Alliance filed suit in the District of Idaho, alleging the Forest Service violated the NFMA, ESA, and NEPA and acted arbitrarily and capriciously under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), when it finalized the Lost Creek Project. The Alliance requested the district court enjoin implementation of the Project. On August 31, 2016, the district court granted summary judgment for the Forest Service and Adams County, concluding that the Project was consistent with the 2003 Forest Plan and applicable law, and that the Forest Service had not acted arbitrarily or capriciously in approving the Project. Notably, the district court concluded that the Lost Creek Project was consistent with the 2003 Payette Forest Plan. The district court denied the Alliance's cross-motion for summary judgment, and entered judgment in favor of the Forest Service. The Alliance timely appealed.

## II. Standard of Review

The court reviews challenges to final agency action decided on summary judgment de novo. *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 973 (9th Cir. 2003). Review is based on the administrative record. *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

Agency decisions that allegedly violated NFMA and NEPA are reviewed under the APA. *Native Ecosystems*

*Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1238 (9th Cir. 2005). Under the APA, courts shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Nevertheless, the agency must "examine the relevant data and articulate a satisfactory explanation for its action." *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 878 F.3d 725, 732 (9th Cir. 2017) (internal quotation marks and citation omitted). We will strike down an agency action as arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or if the agency's decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* at 732–33 (internal quotation marks and citation omitted).

## III. Discussion

### A. The Project's Change from MPC 5.2 to MPC 5.1

The 2003 Payette Forest Plan sets forth a management directive for the Payette National Forest by establishing desired conditions for the forest, and then setting standards and guidelines designed to achieve or maintain those conditions. In sum, the desired conditions can be viewed as the long-term goals for the forest as a whole, and the Plan's standards and guidelines set forth the manner in which the Forest Service is to achieve those goals. Any site-specific

project must be consistent with the Forest Plan's standards, guidelines and desired conditions. *See* 36 C.F.R. § 219.15.

Here, the Alliance argues that the Project is inconsistent with each of these three Forest Plan components—standards, guidelines, and desired conditions. Specifically, under the 2003 Plan, certain land is designated as MPC 5.1 (restoration) and certain land is designated as MPC 5.2 (commodity production). At issue in the present suit, the Lost Creek Project eliminates MPC 5.2 in its entirety and replaces it with MPC 5.1, which affects land in MA3. The Alliance argues that the final ROD for the Lost Creek Project is arbitrary and capricious because the standards, guidelines, and desired conditions that determine the forest conditions for MPC 5.1 are different from those for MPC 5.2. We agree. We address the Forest Plan's standards, guidelines, and desired conditions in turn.

### 1. Standards

"Standards" are binding limitations typically designed to prevent degradation of current resource conditions. The switch from MPC 5.2 to MPC 5.1 resulted in the loss of at least one fire standard on MA3.

A site-specific project must comply with the standards set forth in the governing forest plan, 36 C.F.R. § 219.15(d)(2), and a project's deviation from a standard requires amendment to the forest plan, *id.* § 219.15(c). Here, the switch from MPC 5.2 to MPC 5.1 would lead to the loss of Fire Standard 0312, which states that "[w]ildland fire use is prohibited." MPC 5.2 contains a binding fire standard, whereas MPC 5.1 contains no fire standards at all. Because standards are *binding* limitations on Forest Service's activity, the elimination of this fire standard on the Project's newly-designated MPC 5.1 land constitutes a clear violation

of the NFMA. *See* 16 U.S.C. § 1604(i); *Native Ecosystems Council*, 418 F.3d at 961.

Adams County urges this Court to overlook this inconsistency on the ground that the fire proscriptions for MPC 5.1 and MPC 5.2 are "substantially similar," in that only prescribed fire may be used under either category. We decline to speculate on the effects of prescribed fire on MA3, which is not discussed by the agency in support of its conclusion that the Lost Project is consistent with the Forest Plan. It is undisputed that MPC 5.1 establishes no fire standards for MA3. Rather, MPC 5.1 contains Fire Guideline 0309, which permits the "full range of treatment activities, except wildland fire use" on land within MA3. Though the Forest Service argues that the Project area will be more resilient to fire after the switch to MPC 5.1, it is not clear that Fire Guideline 0309 constitutes the complete, binding prohibition on wildland fire contained in Fire Standard 0312. Moreover, our scope of review does not include attempting to discern whether the new standards are substantially similar. *See Native Ecosystems Council*, 418 F.3d at 961 ("Our scope of review does not include attempting to discern which, if any, of a validly-enacted Forest Plan's requirements the agency thinks are relevant or meaningful. If the Forest Service thinks any provision of the 1986 HNF Plan is no longer relevant, the agency should propose amendments to the HNF Plan altering its standards, in a process complying with NEPA and NFMA, rather than discount its importance in environmental compliance documents."). In any event, a guideline does not impose a mandatory constraint on project planning and activity in the way a standard does. *See* 36 C.F.R. § 219.7(e)(1)(iii)–(iv). Accordingly, we conclude that the switch from MPC 5.2 to MPC 5.1, which resulted in the loss of a binding standard under the existing Forest Plan, constitutes a violation of the

NFMA. *See* 16 U.S.C. § 1604(i) ("Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans."); 36 C.F.R. § 219.15(d)(2) (site-specific project is consistent with the forest plan where it complies with applicable standards). The Forest Service's failure to articulate a rational explanation for deviation from the Plan's standard and from agency regulations that require consistency with the Plan was arbitrary and capricious. *See Native Ecosystems Council*, 418 F.3d at 964; *see also Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1176 (9th Cir. 2011) ("Agency decisions that allegedly violate . . . NFMA are reviewed under the [APA], and may be set aside only if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." (quoting *Or. Natural Res. Council Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007)).

## 2. Guidelines

The Lost Creek Project similarly deviates from the 2003 Plan's guidelines. "Guidelines" are a "preferred or advisable course of action" to help maintain or restore resource conditions or prevent resource degradation. A project must either comply with applicable guidelines or be designed in a way that is as effective in achieving the purpose of the applicable guidelines. 36 C.F.R. § 219.15(d)(3)(i), (ii); *see also* 36 C.F.R. § 219.7(e)(1)(iv). In MA3, the elimination of MPC 5.2 results in the loss of Fire Guideline 0313, which details when prescribed fire may be used. The Forest Service does not explain, or for that matter attempt to explain, how the elimination of this guideline in the Lost Creek Project is consistent with the 2003 Plan, *id.* § 219.15(d)(3)(i), or how the Project as a whole is as effective as the 2003 Plan in achieving the purpose of the applicable guidelines, *id.*

§ 219.15(d)(3)(ii), as is required by agency regulations. Rather, the management direction for MA3 simply states that Fire Guideline 0313 will be deleted, without discussing any replacement provision. Moreover, the Forest Service's explanation of "consistency" in the Project FEIS does not reconcile the loss of MPC 5.2's guidelines, but contains only the bare statement that MPC 5.2 is "[o]utside the scope of the project." The agency is required to "articulate a satisfactory explanation for its action." *Turtle Island Restoration Network*, 878 F.3d at 732 (quoting *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43); 36 C.F.R. § 219.15(d) ("A project or activity approval document must describe how the project or activity is consistent with applicable plan components . . . ."). Here, the agency's explanation is, in effect, no explanation at all. Accordingly, we conclude that the elimination of the existing guideline was contrary to the 2003 Plan in violation of the NFMA, *see* 16 U.S.C. § 1604(i); 36 C.F.R. § 219.15(d)(3)(i)–(ii); *Native Ecosystems Council*, 418 F.3d at 961, and the Forest Service's failure to articulate a satisfactory explanation for the elimination of Fire Guideline 0313 was arbitrary and capricious.

### 3. Desired Conditions

The switch from MPC 5.2 to MPC 5.1 similarly renders the Project inconsistent with the desired vegetative conditions set forth in the Payette Forest Plan. Unlike the strict adherence required for standards and guidelines, a site-specific project is consistent with the "desired conditions" set forth in the governing forest plan if the project "contributes to the maintenance or attainment of one or more . . . desired conditions, . . . or does not foreclose the opportunity to maintain or achieve any . . . desired conditions . . . over the long term." 36 C.F.R. § 219.15(d)(1).

Appendix A to the 2003 Plan sets forth desired vegetative conditions for the Payette Forest. It is undisputed that the desired vegetative conditions for MPC 5.2 land differ from those of all other MPCs under the 2003 Plan, specifically with regards to tree size class and canopy distribution. Roughly stated, land within MPC 5.2 should have fewer large trees and a greater degree of canopy closure, whereas land outside MPC 5.2 should have a higher percentage of large trees and a lower percentage of canopy cover.[2]

The Forest Service and Adams County concede that the switch from MPC 5.2 to MPC 5.1 constitutes a departure from the desired conditions set forth in the 2003 Plan, but urge this Court to accept that desired conditions are "flexible" and may be altered in the short term. For the reasons discussed below, although we agree with Defendants that the Plan grants the Forest Service a certain degree of flexibility in the short term, we conclude that the Plan does not permit the Forest Service to abandon desired conditions in favor of different conditions entirely, without consideration of effects in the long term. *See* 36 C.F.R. § 219.15(d)(1) (project must contribute to the maintenance

---

[2] The Plan delineates the desired conditions for each "potential vegetation group" (PVG), both within MPC 5.2 and outside of MPC 5.2. For example, with regards to tree size, areas of "Dry Grand Fir" (PVG 5) outside MPC 5.2 should be composed of 3-4% grass, forb, shrub and seedling, and 66-84% large trees. In contrast, within MPC 5.2, the desired composition of tree size for PVG 5 is 4-7% grass, forb, shrub and seedling, and 33-65% large trees. Similarly, with regard to canopy distribution, there is a difference in the desired conditions on MPC 5.2 land versus non-MPC 5.2 land. For example, looking at areas of "Dry Grand Fir," on MPC 5.2 land, 3-23% of the canopy should have "low closure," whereas on non-MPC 5.2 land, 25-45% of the canopy should have low closure.

of desired conditions or must not foreclose desired conditions over the long term).

"Desired condition" is defined in the Payette Forest Plan as "a portrayal of the land, resource, or social and economic conditions that are expected in 50–100 years if management goals and objectives are achieved. A vision of the long-term conditions of the land." The 2003 Plan contemplates that movement away from a desired condition in the short term may facilitate the achievement of the desired condition in the long term. The Plan's Vegetation Guideline VEGU01 states:

> During site/project-scale analysis, tradeoffs in the achievement of one or more of the vegetative components described in Appendix A may need to be considered. Current conditions of the vegetation may necessitate the need to move one component away from the desired condition in order to move another one toward the desired condition. In these situations, decisions should be based not only on which vegetative component is important to emphasize at any point in time to meet resource objectives, but also how to effectively move all components toward their desired condition over the long term.

Citing to this language, Adams County argues the Project's switch from MPC 5.2 to MPC 5.1 is a short-term trade-off that will not preclude the Forest from moving closer to the MPC 5.2 desired conditions specified in the 2003 Plan. We disagree.

The 2003 Plan permits the Forest Service to deviate from the desired conditions in one vegetative component, if that

deviation will help achieve those desired conditions in another vegetative component. VEGU01 does not authorize the elimination of the desired conditions for MPC 5.2 and their replacement with the desired conditions in MPC 5.1, as occurred here. Rather, consistent with 36 C.F.R. § 219.15(d)(1), VEGU01 instructs the Forest Service to manage the Plan's vegetative components in a manner that moves all components toward their desired conditions in the long term. The Forest Service has not articulated how the switch from MPC 5.2 to MPC 5.1 moves all components toward their desired conditions over the long term, as it is required to do under the 2003 Plan and agency regulations. 36 C.F.R. § 219.15(d)(1). Rather, the Forest Service has simply replaced the existing desired conditions with new and different ones.

We reject Adams County's contention that the switch to from MPC 5.2 to MPC 5.1 avoids any unlawful inconsistencies because desired conditions may still be achieved in the long term. Adams County relies on a "White Paper regarding MPC 5.1 vs 5.2 desired conditions," authored by Forest Vegetation Specialist Paul Klasner, which states that the switch to MPC 5.1 does not preclude attainment of MPC 5.2 desired conditions because "[f]uture project decisions in the LCBC project area could still choose to move closer to the desired conditions for MPC 5.2 as this decision would not preclude the attainment of MPC 5.2 desired conditions." Even assuming that Mr. Klasner's white paper represents the official position of the agency, the abstract possibility that the Forest Service may someday revert back to the desired conditions set forth in the 2003 Forest Plan is not evidence that the *present* deviation will move the Forest closer toward existing desired conditions

over the long term, as is required to show consistency with the 2003 Plan.[3] 36 C.F.R. § 219.15(d)(1).

In its remaining points, the Forest Service seeks to reassure us that MPC 5.1 is consistent with the 2003 Plan, by reference to portions of the Project FEIS and the Plan containing highly technical discussions of vegetation conditions. This is not a statement of consistency that the Court can reasonably be expected to review or that is entitled to deference. *See Friends of the Wild Swan v. Weber*, 767 F.3d 936, 947 (9th Cir. 2014) ("The Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference, but we must be able to reasonably discern from the record that the Forest Service complied with the plan's standards." (internal quotation marks and citations omitted)); *see also Nat. Res. Def. Council*, 828 F.3d at 1132–33 ("[I]f the agency itself did not provide reasons to satisfy the above standard, we will not use our own line of reasoning to bolster the agency decision on grounds that it did not include in its reasoning."). Moreover, the Forest Service's assurances on appeal are not reflected in the record, which shows clear deviations from the desired condition set forth in the 2003 Plan. *See Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 936 (9th Cir. 2010) ("fuzzy assurance[s]" do not erase the specific inconsistencies identified in the record). For these reasons, we conclude that the switch from MPC 5.2 to MPC 5.1, which resulted in the imposition of new desired vegetative

---

[3] Under the APA, an agency may rely on the position stated in a white paper, but must still explain its decision sufficiently to determine compliance with applicable law. *See Nat. Res. Def. Council, Inc. v. Pritzker*, 828 F.3d 1125, 1140 (9th Cir. 2016). Adams County overlooks the fact that in the Project FEIS the Forest Service neither relies on Mr. Klasner's white paper, nor explains how the new desired vegetative conditions comply with the Forest Plan.

conditions with the potential to alter the landscape, was inconsistent with the 2003 Plan. *See* 16 U.S.C. § 1604(i); 36 C.F.R. § 219.15(d)(1).

### B. The Project's Definition of "Old Forest"

In its second NFMA claim, the Alliance contends that the Project's definition for "old forest habitat" is inconsistent with the definition of "old forest" in the 2003 Forest Plan. Specifically, the Alliance contends that the Project uses the criteria for "old forest habitat" found in the WCS amendments, as opposed to the Plan.

Appendix A to the 2003 Forest Plan establishes the desired vegetative conditions for "old forest." Unlike the switch from MPC 5.2 to MPC 5.1, which was limited to land in MA3, a change to the definition of "old forest" potentially affects vegetation conditions throughout the Lost Creek Project.

Here, again, the Lost Creek Project deviates from a standard set forth in the Payette Forest Plan. In its discussion of old forest and old growth, the 2003 Plan sets forth a standard that requires maintaining at least 20 percent of the acres within each forested PVG in the large tree size class.[4] This standard is aimed at helping certain species that are dependent upon large trees. Where the large tree size class constitutes less than 20 percent of the total PVG acreage, management action shall not decreases the current area occupied by the large tree size class, except where, among other things, management actions would not degrade or

---

[4] The Lost Creek Project area contains all of the Plan's eleven PVGs, except PVG 4.

retard attainment of desired vegetation conditions in the short or long-term.

The Project FEIS does not discuss this standard. It also adopts the definition of "old forest habitat" from the WCS DEIS, instead of the definitions of "old forest" and "old growth" from the 2003 Plan. On appeal the Forest Service assures the Court that there has been no change to the definition of "old forest," only newly-added quantitative criteria that "flesh out" the Plan's existing definition of "old forest." In spite of these assurances on appeal, the Project FEIS clearly states that "no stands have been identified in the project area that meet all attributes that characterize old forest habitat as defined in proposed [WCS amendments]." This is facially inconsistent with the Plan, which acknowledges historic presence of both large tree size class and old growth in virtually all of the PVGs, and mandates specific percentage of large tree size class on each PVG.

On this record we cannot say that the Forest Service "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Pyramid Lake Paiute Tribe of Indians v. U.S. Dept. of Navy*, 898 F.2d 1410, 1414 (9th Cir. 1990) (citations omitted). The Forest Service's decision to adopt a new definition of "old forest habitat" for the Project area is, accordingly, arbitrary and capricious.

C. The Project's Minimum Road System Designation

The Alliance also challenges the Forest Service's decision to designate a minimum road system ("MRS") for the Lost Creek Project that exceeds the number of miles in the MRS recommended in the Forest Service's Travel Analysis Report for the Project area. The Travel Management Rule sets forth rules for travel and

transportation systems in national forests. Administration of the Forest Development Transportation System, 66 Fed. Reg. 3206 (Jan 12, 2001) (Subpart A codified at 36 C.F.R. §§ 212.1 to 212.21).[5] Relevant here, the Forest Service must "identify the [MRS] needed for safe and efficient travel and for administration, utilization, and protection of National Forest System lands." 36 C.F.R. § 212.5(b)(1).

> The minimum system is the road system determined to be needed to meet resource and other management objectives adopted in the relevant land and resource management plan . . . , to meet applicable statutory and regulatory requirements, to reflect long-term funding expectations, to ensure that the identified system minimizes adverse environmental impacts associated with road construction, reconstruction, decommissioning, and maintenance.

*Id.* The Forest Service must also designate roads for decommissioning. *Id.* § 212.5(b)(2). Designation of the MRS and road decommissioning must be accomplished by completing a "science-based roads analysis at the appropriate scale," and incorporating, to the degree practicable, the interests of affected citizens and state, local, and tribal governments. *Id.* § 212.5(b)(1). This process results in a "travel analysis report" for a given area, which sets forth a recommended MRS for a given area. Generally speaking, the analysis and recommendation provided in the

---

[5] Subpart B of the Travel Management Rule, promulgated four years later, in 2005, is not at issue in the present case. *See* Travel Management; Designated Routes and Areas for Motor Vehicle Use, 70 Fed. Reg. 68,264 (Nov. 9, 2005) (codified at 36 C.F.R. §§ 212.50–212.57).

travel analysis report will inform the agency's analysis during the subsequent NEPA process for a particular site-specific project.

In connection with the Lost Creek Project, the Forest Service completed a travel analysis report ("the Report"), that identified 474 existing miles of roadway in the Project area. The Report makes a management recommendation for each road, which corresponds to desired conditions and activities for the existing management areas under the 2003 Payette Forest Plan. The Report's recommended MRS reflects the roads that received recommendations in the Report for "maintain," "maintain or improve," or "improve." Here, the Report recommends approximately 240 miles of roads for the MRS, 68 miles of roads for decommissioning, and 149 miles of roads for long-term closure or "LTC."

In spite of the recommendation contained in the Report, the Project's ROD adopts a MRS with 401 miles of roads. This is a reduction from the 474 miles of existing roads in the Project area, but an increase from the 240 miles of road recommended in the Report. We reject the Alliance's contention that this rendered the Project's MRS arbitrary and capricious.

In designating the MRS for the Project, the Forest Service satisfied the requirements of 36 C.F.R. § 212.5(b). First, the FEIS supports its decision by discussing the resource and management objectives adopted in the relevant land and resource management plan in relation to roads in a section devoted to "Transportation." This section discusses the forest-wide goals, objectives, and standards for roads under the existing Forest Plan. These include protecting resources, providing recreational experiences, and providing safety and welfare of users. Second, the FEIS addresses the "applicable regulatory requirements" in its discussion of the

Travel Analysis Process and 36 C.F.R. § 212.5. Here the Forest Service identifies the same key issue the Alliance complains of: the fact that the number of roads selected for the MRS and their maintenance level could affect sediment rates and long term watershed functionality. Third, contrary to the Alliance's contention, this section also contains a robust discussion of maintenance costs for each alternative and accounts for "long-term funding expectations." The discussion explains that funding derives from a variety of sources, and that future maintenance costs and environmental effects will be reduced through various activities, such as graveling soft spots and riparian areas. Finally, as discussed above, the environmental impacts associated with road construction, reconstruction, decommissioning and maintenance are discussed at length in the FEIS. Long-term effects, direct and indirect effects, and cumulative effects are similarly analyzed for all alternatives with regards to watershed conditions.

Though Alternative C, the Alliance's preferred alternative, provides the most benefits for watershed restoration, the FEIS concluded that Alternative C was financially inefficient and did not meet other management objectives under the Forest Plan. The Forest Service concluded that Alternative C was less beneficial for tree size class, left portions of the area susceptible to insects and wildfire, and would restore fewer acres for certain ESA-listed species. The Alliance does not challenge any of these conclusions.

Because the Forest Service fully explained its decision in selecting Alternative B as the appropriate MRS for the Project and considered each of the factors listed under 36 C.F.R. § 212.5, we conclude that the Project's MRS designation was not arbitrary or capricious.

## D. Tiering

The Alliance contends that the Project FEIS violates NEPA by improperly incorporating—or "tiering to"—the WCS amendments. Ordinarily, an agency can avoid some of the burdens of the NEPA process by "tiering" to a prior document that has itself been the subject of NEPA review. "Tiering" is defined as "avoiding detailed discussion by referring to another document containing the required discussion," *Kern*, 284 F.3d at 1073, and, under Council for Environmental Quality ("CEQ") regulations, it is expressly permitted:

> Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review. Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action.

40 C.F.R. § 1502.20. CEQ regulations further state that "[t]iering is appropriate when the sequence of statements or analyses is . . . [f]rom a program, plan, or policy

environmental impact statement to a program, plan, or policy statement or analysis of lesser scope or to a site-specific statement or analysis." 40 C.F.R. § 1508.28(a). The Ninth Circuit has further interpreted these regulations to only permit tiering to another environmental impact statement. *League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211, 1219 (9th Cir. 2008) (collecting cases); *see also Kern*, 284 F.3d at 1073 ("However, tiering to a document that has not itself been subject to NEPA review is not permitted, for it circumvents the purpose of NEPA."). This is because in order to comply with NEPA, the agency must "articulate, publicly and in detail, the reasons for and likely effects of those management decisions, and . . . allow public comment on that articulation." *Kern*, 284 F.3d at 1073.

Alternatively, where an agency merely incorporates material "by reference," without impeding agency and public review of the action, the agency is not improperly tiering. *See* 40 C.F.R. § 1502.21 ("Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action."); *California ex rel. Imperial Cty. Air Pollution Control Dist. v. U.S. Dep't of the Interior*, 767 F.3d 781, 792–93 (9th Cir. 2014). Ultimately, when reviewing for NEPA compliance, we look to whether the agency performed the NEPA analysis on the subject action. *See Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 809 (9th Cir. 1999).

The Alliance argues that the WCS amendments are policy decisions that have not undergone the full NEPA review, and are improperly relied upon in the Project FEIS to justify deviations from the policies set forth in the Payette Forest Plan. We note at the outset that because the WCS

amendments themselves are an agency policy statement, not a NEPA document, tiering to this document would be categorically improper under the CEQ regulations. *League of Wilderness Defs.-Blue Mountains Biodiversity Project*, 549 F.3d at 1219. Similarly, although the WCS DEIS is a NEPA document, adopting the scientific analysis in the WCS DEIS would be improper because that document did not undergo public comment and was therefore not subject to the full NEPA review. *See Kern*, 284 F.3d at 1073.

Nevertheless, we do not find that the Forest Service's reliance on the WCS DEIS improper. The Alliance identifies two aspects of the Project FEIS that it contends constitute improper tiering. First, in its analysis of desired conditions, the Project EIS "incorporates the science and updated data from the draft [WCS DEIS]," which is "new and/or different science, or interpretation of science than the Forest Plan." The FEIS also "utilizes desired conditions for MPC 5.1 . . . in lieu of those for MPC 5.2, when differences exist." Second, the Project's analysis of wildlife species and their habitats "was completed using the best available science used in the WCS DEIS." This included adopting the "fundamental concept of the WCS DEIS," that species have a greater likelihood of sustainability in habitats that are within the "historic range of variability." The Project applies the habitat groupings employed in Appendix E of the WCS in its analysis of effects of the Project on wildlife. However, notably, the Alliance does not point to any part of the Project FEIS that adopts or incorporates NEPA analysis from the WCS DEIS.

In *Kern*, we held that the EIS for the Coos Bay Resource Management Plan was inadequate because it illegally tiered to an agency guideline document for managing the Port Orford cedar. 284 F.3d at 1073–74. The EIS determined that

all management of the cedar would be within the ranges set in the guideline document. *Id.* at 1074. In rejecting this as improper tiering, the court noted that the EIS thereafter did not provide any analysis of those guideline ranges. *Id.* Because the guidelines themselves were not a document subject to NEPA, the BLM had effectively evaded NEPA review. *See id.* at 1069, 1074. Similarly, in *Muckleshoot Indian Tribe*, we concluded that the EIS for a land exchange on Huckleberry Mountain improperly tiered to the EIS for the applicable land and resources management plan. 177 F.3d at 810–11. As in *Kern*, we found that neither the exchange EIS nor the plan EIS fully analyzed the cumulative impacts of the increased logging on parcels that would be transferred under the exchange, meaning that "the cumulative impacts of land exchanges would escape environmental review." *Id.* Finally, in *Native Ecosystems Council & Alliance for the Wild Rockies v. United States Forest Service ex. Rel Davey*, cited by the Alliance here, the District of Idaho found that the Forest Service's reliance on a landscape "analysis map" of lynx habitat in an environmental assessment (EA) for a commercial thinning project in the Caribou-Targhee National Forest constituted improper tiering. 866 F. Supp. 2d 1209, 1227–28 (D. Idaho 2012). There, like in *Kern* and *Muckleshoot Indian Tribe*, the map had not been subject to any NEPA analysis whatsoever, and the EA similarly did not discuss what effects the removal of the landscape analysis units would have on the lynx, its habitat, and the habitat of the snowshoe hare. *Id.*

In contrast, in *California ex rel. Imperial County Air Pollution Control District*, we looked at an EIS regarding the transfer of water rights agreements and concluded that no improper tiering had occurred. 767 F.3d 781. There, the plaintiffs "fail[ed] to identify relevant material discussed solely in the Transfer [environmental impact report ("EIS")]

or significant information excluded from the Transfer EIS." *Id.* at 793. Because the necessary analysis was in the EIS, we concluded that the agency had merely incorporated the environmental report by reference, which was not precluded by NEPA. *Id.* at 793–94.

Unlike *Kern* and *Muckleshoot Indian Tribe*, this case does not involve an EIS that lacks the required NEPA analysis. Rather, the portions of the Project FEIS identified by the Alliance show that Forest Service relied on data and science prepared for the WCS DEIS. This might be considered improper tiering, but for the fact that the Project FEIS goes on to analyze the desired conditions for MPC 5.1 and the wildlife habitat categories from the WCS amendments in the context of the present project, including analyzing the cumulative, direct and indirect effects on vegetative resources and wildlife. The Alliance has not identified any required analysis that was not performed in the Project FEIS. To the extent the Alliance challenges the adoption of WCS standards in lieu of the Payette Forest Plan's standards, this might give rise to a separate NFMA claim, but it does not, in and of itself, constitute improper tiering under NEPA, as we have previously understood and applied that term. *See* 40 C.F.R. § 1502.20. We accordingly reject the Alliance's contention that the Forest Service violated NEPA by incorporating the standards and science underlying the WCS amendments.

## IV. The Alliance's ESA Claim

The Alliance challenges the Forest Service's failure to reinitiate consultation with the United States Fish and Wildlife Service for the endangered bull trout under Section 7 of the ESA. The parties now agree that in light of the Forest Service's decision to reinitiate consultation for the bull trout over its entire range, including the Payette National Forest,

that claim is moot. We agree and will grant the Forest Service's motion to dismiss the ESA claim. The portion of the district court's decision addressing the Alliance's ESA claim is vacated pursuant to *United States v. Munsingwear*, 340 U.S. 36, 39 (1950). *See NASD Dispute Resolution, Inc. v. Judicial Council of Cal.*, 488 F.3d 1065, 1068 (9th Cir. 2007) ("Under the '*Munsingwear* rule,' vacatur is generally 'automatic' in the Ninth Circuit when a case becomes moot on appeal." (quoting *Publ. Util. Comm'n v. FERC*, 100 F.3d 1451, 1461 (9th Cir. 1996)). Here, mootness was not caused by the Alliance in an attempt to evade an adverse decision. We see no reason not to vacate the lower court's decision on this claim. *See id.* at 1069.

## V. Injunctive Relief

Having determined that the Forest Service violated the NFMA, we must determine the appropriate relief. "Although not without exception, vacatur of an unlawful agency action normally accompanies a remand." *Alsea Valley All. v. Dep't of Commerce*, 358 F.3d 1181, 1185 (9th Cir. 2004). This is because "[o]rdinarily when a regulation is not promulgated in compliance with the APA, the regulation is invalid." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995). When equity demands, however, the regulation can be left in place while the agency reconsiders or replaces the action, or to give the agency time to follow the necessary procedures. *See Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010); *Idaho Farm Bureau Fed'n*, 58 F.3d at 1405. A federal court "is not required to set aside every unlawful agency action," and the "decision to grant or deny injunctive or declaratory relief under APA is controlled by principles of equity." *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995). "A plaintiff seeking a preliminary injunction must establish that he is

likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council Inc.*, 555 U.S. 7, 20 (2008). "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

Here, absent *vacatur*, the Project will result in the management of certain land for restoration, instead of commodity production, and lead to the imposition of a new definition of "old forest habitat." These changes will result in the loss of several binding standards under the existing forest plan. This is sufficient to justify *vacatur*. *See Idaho Sporting Cong., Inc.*, 305 F.3d at 966 ("If the Forest Plan's standard is invalid, or is not being met, then the timber sales that depend upon it to comply with the Forest Act are not in accordance with law and must be set aside." (citation omitted)). We further note that under the Project FEIS, commercial thinning is authorized on a large portion of the Project area. Adams County has not addressed any of these potential environmental harms, such as the unexplained absence of "old forest habitat" on the Project area, and therefore has not overcome the presumption of *vacatur*. *See Alsea Valley All.*, 358 F.3d at 1185.

## VI. Conclusion

We affirm the district court's ruling that defendants did not act arbitrarily and capriciously in approving the Minimum Road System. We also affirm the district court's conclusion that the Forest Service did not violate NEPA by

improperly tiering to the WCS amendments or the WCS DEIS.  We reverse the district court's conclusions that the Forest Service did not violate the NFMA in approving the Project's switch from MPC 5.2 to MPC 5.1 and the new definition of "old forest habitat."  Because the ESA claim is moot, we vacate the district court's decision and judgment with regards to that claim only.

**AFFIRMED IN PART, REVERSED and REMANDED IN PART.** The parties shall bear their own costs on appeal. On remand the district court is instructed to vacate the Forest Service's September 2014 final record of decision and remand to the Forest Service for further proceedings consistent with this Opinion.

Defendants-Appellees' Motion to Dismiss is **GRANTED**. (Doc. 50.) The Alliance's ESA claim is **DISMISSED** as moot. The portion of the district court's decision and judgment with regards to the Alliance's ESA claim is **VACATED**.